Filed 10/19/21  P. v. Samaniego CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D076709 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD264152) |
| JOSE LUIS SAMANIEGO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Peter L. Gallagher, Judge.  Affirmed.

Cynthia Grimm, under appointment by the Court of Appeal, for Defendant and Appellant.

Matthew Rodriquez, Acting Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Andrew Mestman, Deputy Attorneys General, on behalf of Plaintiff and Respondent.

## INTRODUCTION

On a January 2001 night, while Edgar M. was leaving Gloria I.'s home and walking toward the car his friend Alexander C. (Alex) was driving, Edgar

encountered two teenagers. One fired several bullets at Edgar, hitting him in the chest, the flank, and the arm. One of the bullets hit Alex in the head, causing Alex's death. Edgar worked with police to develop a composite sketch of the shooter, but no one was arrested in connection with the crime until more than a decade later, when confidential informants supplied police with information leading police to reopen the cold case.

After reopening and investigating the shooting incident, police arrested Christopher Aranda, Enrique Palomino, and Jose Samaniego. Ultimately, police charged Samaniego with the attempted murder of Edgar and the murder of Alex. At trial, Aranda admitted he had been nearby at the time of the shooting but testified he did not participate in it and had no knowledge it was going to occur. He told the jury that immediately following the shooting, Palomino implied Samaniego was the shooter. Palomino testified he was present at the shooting, and he named Samaniego as the shooter.

Samaniego's defense was primarily misidentification, arguing he did not fit the description of the shooter. There was also some evidence that Samaniego may have acted in self-defense.

A jury convicted Samaniego for Alex's murder and the premeditated attempted murder of Edgar (Pen. Code,[1] §§ 187, subd. (a), 189, & 664), as well as the intentional and personal discharge of a firearm in the commission of the crimes (§ 12022.53).

He appeals the convictions, contending a multitude of errors justifies their reversal. Specifically, he maintains the court erred by (1) refusing requests to include witness impeachment evidence of prior arrests and misdemeanor convictions; (2) offering CALCRIM Nos. 3471 and 3472 as jury instructions; (3) declining to instruct the jury on prior threatening conduct;

---

[1]     Unspecified section references are to the Penal Code.

2

(4) failing to instruct the jury with a pinpoint instruction regarding transferred intent under a self-defense theory; (5) refusing to offer instructions for voluntary manslaughter; (6) failing to give a direct instruction regarding adoptive admissions; and (7) including eye-witness certainty as a factor for consideration. Samaniego also contends that (8) in closing arguments, the prosecution improperly called for the jury to bring justice to the victims and misstated evidence regarding the confidential informants; (9) the errors resulted in ineffective assistance of counsel; (10) even if individual errors were harmless, cumulatively they were prejudicial; (11) the court improperly denied requests to replace appointed counsel made through a series of *Marsden*[2] hearings; and (12) the court erred by failing to hold an ability-to-pay hearing before imposing a restitution fine under section 1202.4 as well as various fees and assessments, and alternatively that the failure to request such a hearing constituted ineffective assistance of counsel. We disagree with Samaniego and conclude his contentions lack merit. Accordingly, we affirm the judgment.

BACKGROUND AND PROCEDURAL FACTS

The People charged Samaniego in count 1 with the murder of Alex (§ 187, subd. (a)) and with the intentional and personal discharge of a firearm in the commission or attempted commission of the murder (§ 12022.53, subd. (d)); and in count 2 with the premeditated attempt to murder Edgar (§§ 187, subd. (a), 189, & 664), during which he intentionally and personally discharged a firearm (§ 12022.53, subd. (d)).

During the pendency of the case, the electorate passed Proposition 57, the Public Safety and Rehabilitation Act of 2016 (Proposition 57), which prohibits prosecutors from charging juveniles with crimes directly in adult

---

[2] *People v. Marsden* (1970) 2 Cal.3d 118, 123 (*Marsden*).

court. (*People v. Superior Court (Lara)*) (2018) 4 Cal.5th 299, 303.) The Supreme Court held the law applied retroactively (*id.* at p. 314), and Samaniego successfully moved to remand his case to juvenile court because he was under age 18 at the time of the crime. The People requested Samaniego be transferred to criminal court and treated as an adult. Following briefing and a hearing on the matter, the juvenile court transferred Samaniego's case back to criminal court.

The matter proceeded to trial in August 2019.

*The People's Case*

In January 2001, Edgar lived in the San Diego area with his family and was dating Gloria I.,[3] who lived in the Encanto area. Gloria had a one year old and a two year old with Aranda. Gloria and Aranda were on-again, off-again, and in January 2001, they were both dating other people, and she lived alone with their children. Aranda was aware Gloria was seeing Edgar, but he was also trying to work things out with her.

Gloria lived in a home situated below another house. To access her home, a person had to walk down the side of the main house, then down 15-20 steps to her home. Gloria's door was about five steps to the right of the bottom of the stairs; the street was not visible from her front door.

Aranda's grandmother lived next door to Gloria, and he lived nearby. He spent a lot of time at his grandmother's house, visiting her daily, and he visited Gloria frequently as well.

Edgar was not familiar with Gloria's neighborhood, but he would stop at her house to give her rides, and he bought things for her, like food and diapers.

---

[3] Gloria I. was Gloria O. before she was married.

4

Not long before the shooting, Edgar and Aranda ran into each other in front of Aranda's grandmother's house. There was no physical interaction, but Edgar stepped out of his car, and Gloria pulled him back inside. Edgar testified that Aranda had seemed to appear out of nowhere, and when he told Gloria he did not want any problems, she said there would be none.

On January 27, 2001, Edgar spent time with his friend Alex. They used Edgar's car, with Alex driving because he liked the vehicle. Edgar did not have a cell phone, so he used Alex's phone to call Gloria and tell her that he was on his way to her home.

Gloria did not want Edgar to stop by because Aranda was there, but Edgar said he was coming anyway. Aranda left Gloria's to ask his mother if she could babysit that night.

Alex parked across the street from Gloria's house, and Edgar told him to stay in the car. Aranda knew what kind of car Edgar drove, and he saw a car resembling Edgar's near Gloria's house. He was concerned he might get jumped by Edgar and anyone with him, so Aranda went to look for someone to back him up.

Aranda drove six to eight blocks away, where he saw a group in the street in front of the elementary school. He stopped to ask Palomino if he would back up Aranda. He told Palomino he wanted Palomino to come in case there was more than one guy. Palomino got into Aranda's car, and Samaniego got in the car, too. Aranda did not know Samaniego, but he had seen him in the neighborhood, where Samaniego was known as "Pelón," which means "bald," a nickname Samaniego had from the time he was a baby because he did not have a lot of hair.

Aranda drove back to Gloria's house with Palomino and Samaniego and parked catty corner from the house. Aranda told the other two to wait and

have his back.  Then he exited his vehicle and walked down the stairs to Gloria's house.

While Aranda was gone, Edgar went to see Gloria.  Gloria told him she did not want any problems, and she told him she was trying to get back together with Aranda.

Aranda and Edgar ran into each other on the stairs outside Gloria's home.  The two men exchanged words; Edgar told Aranda he understood that this was Aranda's family, that Aranda could have Gloria, and he was leaving. Aranda replied, "Okay, Cool.  Everything's cool."  The two shook hands, then Edgar walked back up the stairs.

### *Edgar's Testimony About the Shooting*

Edgar testified that after he and Aranda shook hands, Aranda did not seem angry with him or threaten him.  He walked up the stairs toward his car, and Aranda followed behind.  When Edgar reached the top of the stairs, he saw two "youngsters" or "peewees" standing in front of the house.  One of them said, "East side," as Edgar passed them.  Edgar turned as if to say, "What?" then laughed and kept walking.  The person said, "East Side Rascals," or something similar again, and Edgar turned toward them.  Edgar had interpreted the statement to mean the person talking was in a gang, and when he turned, one said, "This is what's up," with a gun pulled out, pointed at Edgar.  The person holding the gun began firing the weapon.  Edgar saw Aranda behind the two youngsters, but then Aranda vanished or took off running when the shooting started.

Bullets hit Edgar in the chest, so he began running toward the car Alex was driving and jumped in through the passenger side window.  When he looked back, he saw the shooter was still shooting.  He heard the two males running, and he could hear more shots, so he told Alex to go.  Alex put the car

into drive and plowed into a house one or two doors down. Edgar hit his head during the crash and was knocked out. After he came to, he went to the front door of the house and knocked. He was bleeding and gasping for air, and he called out that he had been shot, then he collapsed inside the home.

*The Injuries*

Alex suffered an inoperable gunshot wound to the head, resulting in his death.

Edgar suffered three gunshot wounds. One was in his chest. A second wound was to his right flank, and it lodged in his abdomen. Doctors performed surgery to determine the extent of the damage, and they discovered the gunshot to the chest lacerated the liver and the diaphragm, and the gunshot to the flank lacerated the bottom half of the right kidney and lodged near the spine. He suffered bleeding in the chest and blood clotting, which required a second surgery six days after the first one. A third bullet was discovered lodged in his arm, near the wrist, about 18 months after the shooting.

*Edgar's Descriptions of the Perpetrators*

When Gloria visited Edgar in the hospital, he told her he thought Aranda was involved.

Edgar described the shooter as Hispanic and the other male as possibly mixed race or Puerto Rican. He said the shooter had slicked-back, collar-length hair and was probably about five foot, eight inches tall. He remembered the shooter wearing a long-sleeved black sweater with two gray stripes across the chest area and both sleeves. He estimated the shooter's age at 16 or 17.

7

He said the second suspect was taller than the first one and had short or shaved hair, like a fade.  He said this suspect was heavier than the shooter.

Edgar worked with police to develop a composite drawing.  The composite does not show someone with collar-length hair because Edgar remembered that later.  Edgar testified the suspects were clean-shaven, but in the composite the suspects were not.

Although Edgar spoke with police in 2001, he did not remember talking to them immediately following the shooting or initially telling an officer that Aranda shot him or later saying that it was Aranda's homeboys who shot him.  He remembered telling an officer that one of the suspects said something like "East San Diego" before shooting him.

*Gloria's Testimony about the Shooting*

After the two men shook hands and Edgar left, Gloria remembered Aranda following her into her house, where they talked.  She could not remember one way or the other if Aranda was with her when she heard the gun shots.

After the shooting stopped, she ran up the stairs to see what happened, then returned home and checked on her children.  She locked the door to her house, then walked back up the stairs and saw Edgar's car crashed into a neighbor's home.

Gloria heard Edgar yelling from inside the neighbor's house, shouting, "Kiki did it."  "Kiki" was Aranda, and she remembered thinking, "How did Kiki do this?  How?  When?  How?"

After Aranda had been questioned by police, he told Gloria he had not shot Edgar.

*Aranda's Testimony*

Aranda testified that he stayed back with Gloria to talk for a few minutes after Edgar left, until he heard pops that sounded like a gun, at which time he ran up the stairs toward the street. At the top of the stairs, he saw a reflection of brake lights on a retaining wall, and he ran the other way, toward his house. As he ran home, Palomino popped out of the bushes, and when Aranda asked Palomino what happened, Palomino said, "That fool tripped." Palomino followed Aranda home, where Palomino waited outside until Aranda brought him a phone to use. A few minutes later, Palomino's mother showed up to give him a ride.

Gloria called Aranda and said the police were at her house, requesting him to return, which he did. Aranda spoke with the police and followed them to the station, where he consented to a gun powder check on his hands. He did not mention Palomino or Samaniego being there.

At his family's suggestion, Aranda left town four days later because he feared retaliation against him or his family if he remained in the neighborhood. He was concerned it looked like he had an altercation with Edgar, and in his neighborhood, people did not cooperate with police because it put them or their family in danger. He never moved back because he feared someone would try to kill him or his family.

Aranda admitted he had participated in gang activity when he was younger, but he distanced himself from gang activity before the shooting incident.

He testified there was no discussion with Palomino or Samaniego about bringing a gun, and he did not know anyone had a gun. After the shooting, he did not ask Palomino what was meant by Palomino's statement "that fool tripped," and he did not want to know. He said Palomino never specifically told him what happened.

9

*Enrique Palomino's Testimony*

Palomino told the jury he had consumed three or four little drinks before Aranda picked him up. Aranda said he was going to argue with someone at Gloria's house. He did not say he wanted to beat up anybody or shoot anybody, and he did not tell Palomino to watch out for anybody. Palomino did not have a gun with him, and he did not ask Samaniego to join them; Samaniego just did.

Once they arrived, the three of them exited Aranda's vehicle and walked up the street toward Gloria's house together. Aranda went down the stairs, and Palomino and Samaniego stayed behind.

Palomino did not see anyone come up the stairs, but he saw a person get in a car, which drove to the corner, then U-turned in front of Palomino. The car was facing away from Palomino and Samaniego when it stopped. The person in the passenger seat exited the vehicle. He was big, and he was wearing a big jacket. He asked Palomino and Samaniego where they were from, which Palomino understood to mean the man was in a gang. Palomino thought the guy had a gun because he thought the person was in a gang, and the person made a motion like he was reaching for a gun. Palomino was about 10 feet away, and he responded by backing up. Palomino did not see Samaniego's gun, but he saw Samaniego shoot Edgar. Palomino ran to Aranda's house, going a different direction from Samaniego.

He called his mom, and she picked him up at Aranda's house. Later, Palomino told Aranda that Samaniego had shot the guy.

He explained that he did not tell police what happened because he had not done anything; he was just there. If he had told police that he saw Samaniego shoot Edgar, he and his family could get in trouble with people in the neighborhood.

10

Palomino thought Samaniego was bald at the time of the shooting.  He remembered that Samaniego had a tail, but he could not remember if Samaniego had one on the day of the shooting.

When police contacted Palomino in 2015, he did not tell them what happened because he feared someone would harm his family if he talked. After an attorney was appointed, he decided to make a deal with the prosecutor so that he would not have to serve a life sentence for first degree murder and could instead serve three years for accessory after the fact.  He said he did not shoot either Edgar or Alex, but he may have told Aranda that he would take credit for it rather than expose himself and his family to the danger of testifying that Samaniego was the shooter.  He also said that since agreeing to testify, he had received threats and feared for himself and his family.

When questioned about his relationship with Samaniego, Palomino admitted they had gotten into some fights and had not been hanging out in the two years preceding trial, but he said he was not testifying because he was mad at Samaniego.

Palomino also testified that he considered himself to be an alcoholic and a drug addict, and he admitted to four DUIs.

*Maria A.'s Testimony*

Palomino's mother, Maria A., testified that she was celebrating her birthday at a party at her home on the day of the shooting in 2001.  Palomino appeared at her party later; she did not know where he was picked up from or who had given him a ride, but it was not her.

Maria noticed that Palomino was very nervous.  He told her about the shooting the next day.  He identified Samaniego, or "Pelón" as the shooter.

11

She felt fearful about testifying because she was one of Samaniego's neighbors and was afraid something might happen.

*The 2001 Investigation*

San Diego Police Department homicide detective Joseph Cristinziani met Aranda the night of the shooting. Aranda was cooperative; police had no reason to suspect he was involved in the shooting at the time. Cristinziani was satisfied that Aranda was telling him the truth based on information he had about the case at the time he interviewed Aranda.

Cristinziani also met with Edgar in the hospital. Edgar said there were two suspects, but he did not identify Aranda as the person who shot him. When police showed Edgar a photo line-up, Edgar tentatively identified one person as the second person present at the shooting and another person as someone he thought could be the shooter, but he could not provide a positive identification. Neither Palomino's nor Samaniego's photos were included in the photo line-up.

An evidence technician conducted a gunshot residue test. Evidence of gunshot residue or an inconclusive result would have meant Aranda's statement was inconsistent with the physical evidence.

Police shared the composite sketch with the media and offered it on Crime Stoppers, and there was a reenactment of the crime on Channel 8, but there were no leads or tips from the media coverage. Cristinziani also explained that the public in that neighborhood would not be cooperative with police because it was a gang neighborhood and the unofficial rule was to not talk to the police.

Manuel Garcia was a gang detective for the San Diego Police Department in 2001. In February 2001, he was on the streets looking for suspects that matched the descriptions of the shooting suspects. Garcia

12

documented contacts on field interview slips. During a field interview, he took a photograph of Samaniego because Samaniego was hanging out with a group that was possibly tagging in the area. Samaniego did not claim a gang membership.

Linda Tibbetts also worked in the gang unit in 2001. She was conducting a field interview of Fabian Martinez when she noted that Samaniego fit the description of one of the suspects involved in the shooting. She could not remember if she had given a copy of her field interview slip to the detectives in the case.

*The 2014-2015 Investigation*

In 2014, a confidential informant came forward with information on the 2001 shooting, stating that Palomino was present. Another confidential informant said Samaniego was involved in the case.

After receiving the information, San Diego Police Department Detective Lori Adams reviewed the case file. She found a polaroid picture of Samaniego in the file, which possibly matched the description of the shooter. She reached out to the DMV for additional photos of Samaniego. She compared the composite photo to the other photographs she had, and she noted similarities between a 2011 photo and the composite of the shooter. In 2011, Samaniego had long, slicked-back hair, and he had similar facial features. He also had long, slicked-back, collar-length hair in his 2015 DMV photos. But in other DMV photos, Samaniego's hair was shaved.

Detective Adams testified that there was no DNA or other physical evidence of any potential suspects at the scene of the shooting. Although Aranda's younger brother was initially the focus of their investigation, when Edgar did not pick him out of the photo line-up, they moved on.

13

Detective Adams also interviewed Edgar.  Edgar described the shooter as having a tail in his hair, and he said it was not Aranda who had shot him.  She reviewed the gunshot residue results and noted they showed a lack of gunshot residue on the swabs taken from Aranda, indicating there was no gun powder residue on Aranda's hands.

When Detective Adams interviewed Palomino at his probation officer's office, Palomino said he was not at the shooting and knew nothing about it.  After being questioned, he removed his GPS monitors and failed to return to his sober living program, which led Detective Adams to believe she had hit a nerve.

Palomino was in custody on another case in October 2015 when police arrested him in the shooting of Alex and Edgar.  Samaniego was arrested the same month.  Aranda was arrested in November.

At one point, Aranda and Samaniego were placed in the same holding cell, and Samaniego asked Aranda about the charges Aranda was facing.  Samaniego said he knew police had at least one witness and maybe one or two more, and there were possibly others who would come forward, but Samaniego would deal with them in his own way.  Aranda felt afraid.  Later, a number of East Side gang members who shared Aranda's cell asked him a lot of questions about the case, which concerned Aranda.

After Palomino was arrested, law enforcement interviewed his mother.  When police asked her to name someone involved, she told them, "I only heard that they would mention el pelón."  She ultimately named Samaniego as the shooter.

Detective Adams thought Palomino was involved, but because he did not match the description of the shooter, she did not think he was the shooter.  Palomino had darker skin and was older than Edgar said the

14

shooter was; the shooter was described as 15 to 16 years old, and Palomino was five years older than that. She also considered the information from the confidential sources along with the description Edgar provided, the location of where Palomino lived, and its proximity to the crime scene.

Palomino's attorney offered information in exchange for a deal. During his "free talk" with the district attorney's office, Palomino told them that he was present to provide back up for Aranda in case Aranda got jumped, but it was clear no one was to get shot or killed, and no guns were involved. Palomino named Samaniego as the shooter.

San Diego District Attorney investigator Sandi Oplinger monitored jail calls and visits. She testified that she was concerned for Palomino's safety after listening to a discussion between Samaniego and his ex-girlfriend Jessica R., in which Samaniego asked Jessica to find out where Palomino was housed.

In another conversation on a recorded line between Samaniego and Jessica while Samaniego was in custody, Jessica told Samaniego that her father would pay for his attorney if Samaniego could look at her father and tell him with 100 percent certainty that he did not shoot Alex and Edgar. He responded that the system was treating him like he was guilty until proven innocent. When Jessica was asked if she understood his response to insinuate guilt, she replied, "Not at all."

*The Defense Case*

San Diego Police Officer Roel Tungcab testified that he spoke with a witness the night of the shooting who described the person running past him as five foot eight to five foot nine, with a military style haircut that was all one length.

15

Isidro O., who was eight years old in 2001, testified that he heard loud noises, and when he looked out the window he saw a man running toward 60th Street. The man was wearing a striped shirt and had short hair that was all one length and was about five foot nine to five foot ten and white.

Araceli A., Samaniego's mother, testified that Samaniego had a shaved head in 2001, not long, collar-length, slicked-back hair. When he was around 15 years old, he had some hair on the back of his head, like a little tail, that was very thin and grew out of the middle of the back of his head. You could see the hair if it was pulled around the side of his head.

When shown a picture of Samaniego from 2002, Araceli testified that the photo resembled him at that time, and she said he had a tail that was not visible in the photo. When shown a picture of Samaniego from 2004 in which the tail was visible, Araceli testified that his hair was the same there as she remembered it being in 2001.

Araceli also testified that Samaniego and Palomino did not get along.

Arturo S., Samaniego's brother, testified that Samaniego was not in a gang and did not spend any time in juvenile hall in middle school or high school. He described Samaniego in 2001 as bald-headed with a ponytail, about five feet or five foot three, and smaller than five foot five. He said Samaniego's tail was long, probably to the middle of his back, and if you looked at Samaniego straight on, you could see the tail bouncing around, or if it came over his shoulder, it was visible. Otherwise, Samaniego kept his head shaved tight with a razor blade.

The defense also called John Wixted, a psychology professor at UCSD, as a memory expert. Wixted testified that eyewitness identification is unreliable if the witness is in contaminated conditions. The only uncontaminated memory test is the first time a witness's memory is tested,

16

usually with a photo line-up. Witnesses who pick the defendant out of a photo line-up with six pictures including the suspect and five others with similar physical features and say they are sure are "almost never wrong," but those who make in-court identifications are often wrong.

Wixted also testified that composite sketches are unreliable because they will "look like a normal person" with the features of the suspect, but will not resemble the person in memory, and they contaminate the true memory. Further, when asked about an identification conducted by a person who had seen a photo line-up without the defendant included, helped developed a composite sketch of the perpetrator, and only saw the defendant for the first time in court, Wixted said the identification would be unreliable because the composite sketch would replace the memory of the perpetrator's identity.

*The Verdict and Sentencing*

The jury convicted Samaniego of murder of Alex with the intentional and personal discharge of a firearm in the commission or attempted commission of the murder (§§ 187, subd. (a), 12022.53, subd. (d)) and of the premeditated attempted murder of Edgar with the intentional and personal discharge of a firearm (§§ 187, subd. (a), 189, 664, 12022.53).

In October 2019, the court sentenced Samaniego to 25 years to life on count 1, plus 25 years to life, consecutive, for the personal discharge of the firearm, for a maximum of 50 years to life. The court sentenced Samaniego to seven years to life for count 2 and added 25 years to life for the discharge of the firearm, to run concurrently, for a total sentence of 50 years to life.

The court imposed a restitution fine pursuant to Penal Code section 1202.4, subdivision (b) for $10,000, and the additional restitution fine under Penal Code section 1202.45 for $10,000, stayed unless parole or supervision is revoked. It also ordered payment of a security fee under Penal

17

Code section 1465.8 in the amount of $80, a criminal conviction assessment fee pursuant to Government Code section 70373 in the amount of $60, a criminal justice administration fee under former Government Code section 29550.1 in the amount of $154, and a general order of restitution to Edgar and to Alex's family under Penal Code section 1202.4, subdivision (f) to be determined later. The restitution pursuant to Penal Code section 1202.4, subdivision (f) to the victim compensation program was calculated to be a total of $43,625, subject to court modification.

Samaniego timely appealed.

## DISCUSSION

### I.

### WITNESS IMPEACHMENT

#### A. Additional Facts

Samaniego moved in limine to admit the arrests and convictions of Aranda and Palomino. He sought to include evidence of Aranda's convictions: misdemeanor possession of an unlawful knife, misdemeanor driving on a suspended license, disturbing the peace, a driving under the influence related offense that included an excessive alcohol blood level enhancement, and contempt of court. Samaniego also sought the admission of several arrests: three arrests for alien smuggling, inflicting corporal injury on a significant other, preventing or dissuading a witness from testifying, contempt of court, and an out-of-state failure to appear charge.

At the hearing on the motions, defense counsel described Aranda's list of prior offenses as "pretty extensive," but when the court commented that a lot of them were "just contacts," defense counsel agreed that a lot were "contacts or no files." Defense counsel explained that many of the files were purged based on age. The court said it did not see conduct indicating moral

18

turpitude or felony convictions, and defense counsel said there was a domestic violence arrest in 2000. But the court said it was only an arrest, not a conviction, and so not admissible. If defense counsel provided a prior conviction, the court would rule on it, but the court had not seen anything that it could grant.

The defense also sought to introduce numerous arrests and convictions for Palomino. It asked to introduce the following convictions: (1) a 1998 infraction for resisting arrest; (2) a 1998 misdemeanor public nuisance; (3) a 1999 felony burglary; (4) a misdemeanor battery and reckless driving; (5) a 2007 conviction for driving under the influence and on a suspended license; (6) an infraction for public fighting in 2012; and (7) a 2014 felony for driving under the influence of alcohol. The defense also wanted to impeach Palomino using several arrests for driving on a suspended license, driving under the influence of alcohol, possession of narcotics paraphernalia, being under the influence of a controlled substance, resisting arrest, and contempt of court.

In discussing Palomino's prior misconduct, defense counsel explained there was a felony DUI and the remaining convictions were misdemeanors. The court agreed to permit reference Palomino's felony DUI, but it explained misdemeanor DUI did not constitute moral turpitude.

At trial, Palomino testified that he considered himself to be an alcoholic and he had been convicted four times for driving under the influence.

### B. Legal Principles

"A prior felony conviction involving moral turpitude is admissible to impeach a witness." (*People v. Gutierrez* (2018) 28 Cal.App.5th 85, 88 (*Gutierrez*), citing Cal. Const., art. I, § 28, subd. (f)(4), Evid. Code, § 788; *People v. Anderson* (2018) 5 Cal.5th 372, 407 (*Anderson*).) Additionally,

under the "Right to Truth-in-Evidence" provision of the California Constitution (Cal. Const., art. I, § 28, subd. (f)(2)), evidence of past misconduct is admissible for impeachment as long as the conduct involves moral turpitude because it shows a willingness to lie. (*People v. Wheeler* (1992) 4 Cal.4th 284, 292, 295-296 (*Wheeler*).) Although the misconduct giving rise to a misdemeanor is admissible for impeachment, the conviction itself is not admissible. (*Id.* at pp. 297-300.) "[I]mpeachment evidence other than felony convictions entails problems of proof, unfair surprise, and moral turpitude evaluation which felony convictions do not present." (*Id.* at p. 296.)

Evidence of prior misconduct or a prior felony conviction for purposes for impeachment is subject to court discretion under Evidence Code section 352, weighing probative value against prejudicial impact. (*Gutierrez*, *supra*, 28 Cal.App.5th at p. 89; *Anderson*, *supra*, 5 Cal.5th at p. 407 [prior felony conviction]; *People v. Clark* (2011) 52 Cal.4th 856, 931 (*Clark*) [other prior misconduct].) Thus, the rule now is that "the conduct underlying a felony conviction is admissible when it is relevant to impeach a witness, unless the trial court finds that it is more prejudicial than probative." (*Gutierrez*, at p. 89.) Courts consider "the nearness or remoteness in time of a prior conviction." (*People v. Mendoza* (2000) 78 Cal.App.4th 918, 925.) Additionally, "[a] witness may be impeached with any prior conduct involving moral turpitude whether or not it resulted in a felony conviction, subject to the trial court's exercise of discretion under Evidence Code section 352." (*Clark*, at p. 931.)

We review the court's decisions regarding admission of evidence under Evidence Code section 352, weighing its probative value against the undue consumption of time or the danger of undue prejudice, confusing issues, or misleading the jury, for an abuse of discretion. (*People v. Williams* (2008) 43

20

Cal.4th 584, 634-635.)  We generally will not disturb the trial court's exercise of its discretion unless it acted arbitrarily, capriciously, or in a patently absurd manner.  (*Ibid.*; *People v. Homick* (2012) 55 Cal.4th 816, 865.)

## C.  Aranda's Criminal History

Samaniego contends that Aranda's arrests for alien smuggling, inflicting corporal injury on a significant other, and preventing or dissuading a witness from testifying involve moral turpitude, and that his possession of a knife should have been deemed a crime of moral turpitude and so should have been admitted to impeach his credibility.  He further contends that Aranda's other arrests and convictions for driving on a suspended license, fighting in public, contempt of court, and driving under the influence with an excess blood alcohol level were relevant to rebut Aranda's claims that he had not committed any crimes from 2001 to 2015, although he concedes none of this conduct itself involves moral turpitude.

The evidence Samaniego sought to introduce against Aranda was remote in time to Aranda's testimony, with arrests dating back two decades. It also was incomplete, with unknown dispositions and purged files because of their age.  The defense offered no specific proof regarding the conduct underlying arrests, so there were problems of proof that at a minimum would have consumed time to address. (*Wheeler*, *supra*, 4 Cal.4th at p. 296; see *Clark*, *supra*, 52 Cal.4th at p. 932.)  Given the uncertainty regarding the alleged unlawful conduct, its remoteness in time, and its lack of relevance to moral turpitude, we cannot say that the court abused its discretion by excluding these details. (*Gutierrez*, *supra*, 28 Cal.App.5th at p. 88; see Evid. Code, § 352 [appropriate to exclude evidence if its probative value is outweighed by its prejudicial impact].)

21

## D. Palomino's Criminal History

Although Palomino's criminal record is lengthier, Samaniego's desire to use the information suffers from similar problems. Other than the 1999 felony burglary, none of Palomino's excluded convictions necessarily involved crimes of moral turpitude. (See, e.g., *Clark*, *supra*, 52 Cal.4th at p. 932 [theft-related crimes are probative of credibility]; *People v. Chavez* (2000) 84 Cal.App.4th 25, 29-30 [simple battery is not a crime of moral turpitude]; *People v. Castro* (1985) 38 Cal.3d 301, 307, 317 [possession of controlled substance not a crime of moral turpitude].) And, as was the case with Aranda, introducing Palomino's arrests would have entailed problems of proof; Samaniego did not offer evidence that Palomino committed these crimes, merely that Palomino was arrested. (See *Wheeler*, *supra*, 4 Cal.4th at p. 296; *Clark*, at p. 932.)

## E. No Prejudice from Exclusions

While we conclude that the court did not abuse its discretion by excluding the evidence of most of the witnesses' prior arrests and convictions, we also note that there is no reason to believe this decision prejudicially harmed Samaniego.

Although defense counsel did not use evidence of past arrests and misdemeanor convictions to impeach the witnesses, defense counsel challenged the witnesses' credibility in other ways. Aranda was questioned about participation in gang activity, and defense counsel pointed out various lies. Aranda admitted that he had lied to law enforcement, and his charges were reduced from first-degree murder to accessory after the fact only after he began to cooperate with the district attorney. During closing arguments, defense counsel argued that Aranda was not a credible witness, that he had colluded with Palomino to lie, and that if he were really afraid of cooperating

22

with police, he would not have voluntarily gone to the police station the night of the shooting.

The defense also challenged Palomino's credibility. Palomino admitted to drinking three of four drinks the night of the shooting. He testified that when police contacted him, he said he was not there, and he did not tell police what happened. He also testified to being an alcoholic, drinking since the age of 13 or 14, being convicted of three or four DUIs, and he said he was a drug addict. Although he did not go into detail, Palomino mentioned that he was at his probation officer's office when police asked him about the shooting in 2015, and he cut off his ankle bracelets but was arrested a couple months later. During closing arguments, defense counsel described Palomino as "a mess" —an alcoholic with a "ton of DUI's" who was a drug user. He commented that Palomino's body language indicated he did not want to testify, and that only the real shooter would have willingly taken credit for shooting Aranda—something Palomino had indicated he would do. Defense counsel also argued that Palomino's story was inconsistent with the facts because he could not remember anyone walking from Gloria's door to the car, but he did remember the car mysteriously appearing and making a U-turn.

The jury was instructed with CALCRIM No. 316, which told it to consider whether a witness was convicted of a felony, a crime, or other misconduct in evaluating credibility. Thus, the jury had reason to question the witnesses' credibility in evaluating the evidence.

However, the challenges to these witnesses' credibility could easily be overcome by the evidence that pointed to Samaniego as the shooter. Edgar identified Samaniego as the shooter. Palomino's mother told police that Palomino told her immediately following the shooting that Samaniego had shot someone. Other testimony showed that Aranda was not the shooter.

23

For example, Edgar, Gloria, and Aranda all agreed that when Edgar left Gloria's home, there was no conflict between him and Aranda, eliminating any motive for Aranda to be involved in the crime. Edgar's testimony also placed Aranda behind the shooter, appearing only after the shooting started and disappearing shortly thereafter. Although Edgar offered Aranda's nickname "Kiki" in the minutes immediately following the shooting, once he recovered, he did not identify Aranda as the person who shot him.

Additionally, Samaniego's defense was primarily a misidentification defense, and the two perpetrators had different appearances. Witnesses testified that Palomino was darker-skinned and older than the person witnesses described as the shooter. Edgar described the shooter as Hispanic and the other person as possibly mixed-race, Puerto Rican, or Black. He said the shooter was about five feet eight inches tall and wore a sweater with two grey stripes across the chest and sleeves. Isidro O.'s description was similar. He said the shooter wore a striped shirt and was white, with short hair, about five foot nine to five foot ten. In addition to the differences in skin tone, the two assailants had different hair styles. The shooter had slicked-back, collar-length hair, and the other person had short hair, all one length.

Samaniego's attorney argued that Samaniego did not fit the description of the shooter because he did not have slicked-back, collar-length hair. But there was testimony that starting around the time of the shooting, when Samaniego was 15 years old, he was bald except for a tail on the back of his head, visible only if the hair were pulled around the sides. Aside from the tail, which was long, Samaniego kept his head shaved tight. DMV photos of Samaniego in 2011 matched the description of the shooter that Edgar had provided. And police reviewing a photograph of Samaniego taken near the time of the shooting and included with a field interview noted similarities

24

between the description of the shooter and Samaniego and believed a 2011 photograph of Samaniego showed facial similarities to the composite of the shooter. Thus, witness descriptions of the shooter matched Samaniego's appearance at the time, and the description of a tail Samaniego wore explained the potential differences in the description of the hairstyle.

Further, Samaniego's post-arrest behavior pointed to him as the shooter. He made threats to Aranda when they were placed in the same holding cell, saying he would deal with witnesses his own way and that he could get at anybody he wanted. Police were also concerned by information that Samaniego was looking for the location of cooperating witnesses while he was in custody.

Given this evidence against Samaniego, it is not reasonably probable a different outcome would have been achieved even had additional, potentially non-verifiable challenges to the credibility of Aranda and Palomino been offered at trial. (See *People v. Watson* (1956) 46 Cal.2d 818, 836-837 (*Watson*); *People v. Ghebretensae* (2013) 222 Cal.App.4th 741, 751-752 [*Watson* standard applies to evaluate exclusion of impeachment evidence].)

## II.

## USE OF JURY INSTRUCTION CALCRIM NOS. 3471 and 3472

Samaniego next argues the court erred by providing CALCRIM Nos. 3471 and 3472, contending the instructions were inapplicable and confusing. The People maintain that because defense counsel did not object to these instructions at the time of trial, the challenge is forfeited, and Samaniego was not prejudiced from their inclusion.

### A. Legal Principles

We review assertions of instructional error de novo. (*People v. Waidla* (2000) 22 Cal.4th 690, 733 (*Waidla*); *People v. Fiore* (2014) 227 Cal.App.4th

25

1362, 1378.)  We evaluate the correctness of jury instructions from the entire charge of the trial court and not from parts of an instruction or a single instruction.  (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248.)  We also presume jurors understand and follow the court's instructions.  (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

Even if an instruction correctly states a principle of law, if it has no application to the facts of the case, it is an error to offer it.  (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129 (*Guiton*).)  Thus, "instructions *not* supported by substantial evidence should not be given."  (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1050 (*Ross*).)  However, "giving an irrelevant or inapplicable instruction is generally ' "only a technical error which does not constitute ground for reversal." ' [Citation.]"  (*People v. Cross* (2008) 45 Cal.4th 58, 67.)  "[I]nstruction on an unsupported theory is prejudicial only if that theory became the sole basis of the verdict of guilt."  (*Guiton*, at p. 1130.)  Prejudice resulting from this type of error is measured by the *Watson* test.  (*Id.* at p. 1130; *Ross*, at pp. 1054-1055.)

B.  Including CALCRIM No. 3471 was Harmless Error

The court instructed the jury with CALCRIM No. 3471, a self-defense mutual combat instruction that explains that a person who engages in mutual combat or starts a fight only has a claim to self-defense if he actually and in good faith tried to stop fighting, indicated that he wanted to stop fighting and that he had stopped fighting, and gave the opponent a chance to stop fighting.

Samaniego argues that this instruction was irrelevant because mutual combat only applies in situations in which the defendant engages in physical combat.  (See, e.g., *Ross, supra,* 155 Cal.App.4th at pp. 1043-1044, 1051-1052 [describing combat as fighting by swords, via fisticuffs, using switchblades, or

facing off with guns].) Samaniego maintains that at most he verbally confronted Edgar, and there was no evidence of any physical altercation before the gunshots were fired.

The People concede that this instruction was inapplicable because words alone do not constitute "start[ing] a fight," as that phrase is used in CALCRIM No. 3471. Accordingly, this instruction should not have been given.

However, Samaniego did not suffer prejudice as a result. There is no indication the jury applied this instruction to the facts before it. The prosecution did not argue mutual combat prevented Samaniego from claiming self-defense, and there was no evidence of a physical altercation, so there is no reason that the omission of this instruction would have changed the outcome of the case.

Further, Samaniego does not claim there were problems with the self-defense instruction, and nothing indicates the jury rejected the self-defense theory solely because it believed Samaniego had started a physical altercation with Edgar before shooting Edgar. (See *Guiton, supra,* 4 Cal.4th at p. 1129.) Indeed, here the jury rejected any claim of self-defense by concluding that Samaniego had attempted to murder Edgar with premeditation.

### C. Instructing with CALCRIM No. 3472 was Not Erroneous

Samaniego next claims that the jury was improperly instructed with CALCRIM No. 3472 because it was both legally incorrect and inapplicable. He argues CALCRIM No. 3472 should have been modified because there was evidence that Samaniego intended to provoke only a non-deadly confrontation to which Edgar responded aggressively in a manner that Samaniego interpreted to be deadly force, justifying his response with deadly force.

27

Samaniego also contends that if he instigated any confrontation, it was merely verbal, making the instruction inapplicable.

Samaniego's claim that CALCRIM No. 3472 is legally incorrect is without merit. CALCRIM No. 3472 explains that a defendant cannot claim self-defense if his wrongful conduct creates circumstances that justify the adversary's attack. (*People v. Enraca* (2012) 53 Cal.4th 735, 761 (*Enraca*); CALCRIM No. 3472.) In *Enraca*, our Supreme Court held that the predecessor instruction, CALJIC No. 5.55, which was materially the same as CALCRIM No. 3472, was a correct statement of law.[4] (*Enraca*, at p. 761.)

Although the court used the language of "physical attack" as an example of a defendant's wrongful conduct in *Enraca*, at least one appellate court has concluded CALCRIM No. 3472 is appropriate when a preliminarily verbal confrontation escalates into a physical one. In *Eulian*, *supra*, 247 Cal.App.4th at pages 1327-1328, the victim began shouting as she stepped out of her vehicle. The defendant approached her quickly, pointing and yelling at her, poking his finger close to her face. The victim threw cat kibble toward the defendant, and she raised her leg in a manner that looked like she may have kicked or pushed the defendant with her leg. The defendant's mother pulled him away by his arm; when he moved back toward the victim, the victim slapped him. The defendant punched the victim twice, then pulled her from her car and hit her two more times, after which she fell unconscious for a couple minutes. When she awoke, the defendant helped her to her feet and assisted her into her vehicle.

---

4      We recognize that CALCRIM No. 3472 "might require modification in the rare case in which a defendant intended to provoke only a nondeadly confrontation and the victim responds with deadly force." (*People v. Eulian* (2016) 247 Cal.App.4th 1324*,* 1334.) As we explain, the facts here do not create such a situation because of contradictory testimony.

28

The appellate court concluded there was a factual predicate for the use of CALCRIM No. 3472 because the jury could have concluded that the defendant provoked the conflict and continued to be the aggressor until the victim responded, at which point the defendant punched her and knocked her out. (*Eulian, supra*, 247 Cal.App.4th at p. 1334.) Under this interpretation, the defendant was the aggressor by screaming and jabbing his finger toward the victim's face, continuing to argue with her until his mother pulled him away. The court explained that if the victim kicked the defendant before he punched her, the jury could have concluded that the victim did so in response to aggressive conduct. Thus, the defendant did not have the right to use force to settle a physical confrontation that he created. (*Ibid.*)

The defendant in *Eulian* was charged with assault, not attempted murder or murder, but the facts share some similarities. Edgar testified that one of the people who confronted him spoke first, saying, "East Side Rascals," which he understood to be a verbal threat or a gang challenge. Then, when Edgar turned back to them after passing by, he heard the shooter say, "This is what's up," and the gun was already pulled out. If the jury believed Edgar's testimony, it was Samaniego who instigated the confrontation. Under this view of the events, Samaniego's initial interaction was aggressive in its use of reference to gang membership and its implied threat. As the first to threaten, he was the first aggressor. And his use of the weapon almost immediately after confronting Edgar suggests he was prepared to use the weapon to engage in deadly force from the outset. Under this version of events, Samaniego's conduct disqualified him from claiming self-defense.

Palomino testified that Edgar, a big guy wearing a big jacket, exited the vehicle and "started saying stuff," asking where Palomino and Samaniego were from. Palomino thought this meant Edgar was in a gang. Then Edgar

29

began arguing with Samaniego, and Samaniego began shooting. Palomino thought Edgar was acting like he had or may have been reaching for a gun. Under this recitation of the events, the initial aggressor was Edgar, because he got out of the vehicle and confronted Samaniego and Palomino. If the jury believed this version of the events, CALCRIM No. 3472 was irrelevant because Samaniego did not instigate a fight. But because there was a conflict in the facts, it was for the jury to determine whether Samaniego could properly claim self-defense in this case, and we cannot conclude the use of CALCRIM No. 3472 required any modification.

Samaniego separately argues the instruction was incorrect, relying on *People v. Ramirez* (2015) 233 Cal.App.4th 940, which rejected the use of CALCRIM No. 3472 under the circumstances of that case. There, the instruction was inappropriate because it did not allow for the intent to use nondeadly force before the adversary's sudden escalation to deadly force required a deadly response. (*Ramirez*, at pp. 946-947.) In such a circumstance, the defendant's wrongful conduct does not preclude a self-defense claim because the defendant's actions are not intended to create an excuse for deadly force; the deadly force comes in response to the victim's sudden escalation.

But Samaniego's situation is not like Ramirez's because there was evidence before the jury that Samaniego instigated the confrontation, brought a weapon, and almost immediately wielded the firearm and began shooting.

Finally, even if the instruction should not have been given because it was irrelevant, Samaniego did not suffer prejudice as a result. As we explained *ante*, we presume the jury followed the instructions, and if there were no instigation of a fight—contrived or otherwise—to justify offering

30

CALCRIM No. 3472, the jury would have disregarded it as inapplicable under these facts.

## III.

## PRIOR THREATENING CONDUCT

Samaniego contends the court erred by failing to instruct the jury to consider whether Edgar's prior threats were justification for a quicker and harsher reaction than might otherwise be acceptable.

Evidence the victim threatened the defendant is admissible to support a claim of self-defense because that information could impact the defendant's state of mind at the time of the event. (*People v. Minifie* (1996) 13 Cal.4th 1055, 1065; *People v. Humphrey* (1996) 13 Cal.4th 1073, 1085, 1087 [battered women syndrome evidence relevant to reasonableness of defendant's belief].)

Although Samaniego is correct that evidence of a threat by the victim against the defendant is admissible, there was no such evidence in this case. First, it is not clear that the incident Samaniego references on appeal can even be characterized as a threat. In the days before the shooting, Edgar and Aranda ran into each other in front of Aranda's grandmother's house when Edgar stepped out of his vehicle and Gloria pulled him back inside. Aranda testified that Edgar said, "What's going on?" It is not clear why this interaction constituted a threat at all. Further, although Aranda testified that he did not want to get jumped by Edgar and anyone else with him the night of the shooting, he did not testify that his fear was the result of any prior threat Edgar made. In fact, when asked if he had a reason to believe that Edgar might jump him, he said "[t]here was a possibility. I didn't know the situation." But he did not reference any prior interaction to justify this concern.

31

Second, there is no evidence that Samaniego was even aware of this prior interaction between Edgar and Aranda. Samaniego did not testify, and Palomino only testified that Aranda had told him that he was concerned about getting jumped by "some guys" and that he was going to argue with his ex-girlfriend's boyfriend. But there was no testimony that Edgar had conveyed any specific threat to Palomino or Samaniego.

Finally, even had Aranda perceived the earlier interaction as a threat, there is no evidence there was a threat to Samaniego. And Samaniego does not explain why a threat to a third party means he is entitled to the instruction. Thus, the failure to provide instruction that a prior threat by Edgar against Aranda may have justified a quicker or more harsh response by Samaniego was not error.

## IV.

## TRANSFERRED INTENT FOR SELF-DEFENSE

A court has a sua sponte duty to instruct on all theories of a defense when there is substantial support in the evidence for it. (*People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*). This duty arises when it appears a defendant is relying on the defense or when there is substantial evidence to support the defense and the defense is not inconsistent with the defendant's theory of the case. (*Id.* at p. 157.) However, "[a] trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel." (*People v. Lee* (2011) 51 Cal.4th 620, 638 (*Lee*).) The issue here is whether transferred intent constitutes a defense to which this rule applies and if so whether the lack of such an instruction prejudiced Samaniego.

"Traditional self-defense applies where the defendant believes he or she is facing an imminent and unlawful threat of death or great bodily injury,

32

and believes the acts which cause the victim's death are necessary to avert the threat, and these beliefs are objectively reasonable." (*People v. Curtis* (1994) 30 Cal.App.4th 1337, 1357 (*Curtis*).) This defense is available to a defendant who intends to kill or injure a person posing a threat but instead injures or kills a third party under the doctrine of transferred intent. (*Ibid*; *People v. Mathews* (1979) 91 Cal.App.3d 1018, 1024.) Transferred intent can be used by a defendant because the lack of criminal intent follows the act to its consequences. (*People v. Levitt* (1984) 156 Cal.App.3d 500, 507-508 (*Levitt*).)

Although self-defense negates the malice aforethought requirement for murder, transferred intent is not a separate defense with a separate instruction. It is an extension of self-defense. The court had no sua sponte duty to provide a pinpoint instruction, and Samaniego did not request an instruction for transferred intent. (See *Lee, supra*, 51 Cal.4th at p. 638; see also *Levitt, supra*, 156 Cal.App.3d at pp. 507-508 [transferred intent instructions must be given upon request].)

Even had the court erred in failing to provide an instruction for transferred intent, the failure to do so would be "an error of California law alone" at most, "subject . . . , to the *Watson* standard of reversal." (*Breverman, supra*, 19 Cal.4th at pp. 165, 169, 171, 174.)

It is not probable here that an error would have altered the outcome. The court instructed the jury with CALCRIM No. 505, which states that a "defendant is not guilty of murder or attempted murder if he was justified in killing or attempting to kill someone in self-defense or defense of another" as long as "[he] reasonably believed that he or someone else was in imminent danger of being killed or suffering great bodily injury," reasonably believed

that the immediate use of deadly force was necessary, and only used the amount of force reasonably necessary to defend against the imminent danger.

This was an appropriate instruction because the applicability of self-defense was a question of fact. If the jury believed Palomino's testimony that Edgar engaged him first and was reaching for a weapon when Samaniego fired the gun, Samaniego may have had a valid claim of self-defense. If he properly claimed self-defense as to Edgar, that defense would extend to the bullets that unintentionally hit Alex.

However, if the jury believed Edgar's testimony that Samaniego confronted him and began firing almost immediately, or Aranda's testimony that Palomino initially claimed that Samaniego accidentally fired the gun because "that fool tripped," Samaniego would have no self-defense claim to justify shooting Edgar, and the doctrine of transferred intent would be inapplicable. The jury convicted Samaniego of the premeditated attempted murder of Edgar, so it did not find that Samaniego acted in self-defense. Accordingly, it is not probable that the jury would have concluded a claim of

self-defense justified Alex's death because there was no conclusion that Samaniego acted in self-defense at all. (*Watson, supra,* 46 Cal.2d at pp. 836-837.)

## V.

## MANSLAUGHTER INSTRUCTIONS

Samaniego asked for a voluntary manslaughter instruction under a theory of imperfect self-defense. The court denied his request, explaining that the theory lacked the support of substantial evidence because there was no testimony regarding Samaniego's actual belief. Samaniego did not request a voluntary manslaughter instruction based on heat of passion.

He now contends the court erred by failing to offer the jury instructions for manslaughter, claiming there was substantial evidence to support an imperfect self-defense theory as well as to conclude Samaniego acted in the heat of passion.

### A. Legal Principles

A court is obligated to instruct a jury on all theories of a defense supported by substantial evidence, including lesser-included offenses. (*Breverman*, *supra*, 19 Cal.4th at pp. 155, 162.) Substantial evidence in this context means evidence that a reasonable jury could find persuasive and from which it could reasonably conclude the defendant was not guilty of the charged offense because he was instead only guilty of the lesser included offense. (*People v. Mendoza* (2000) 24 Cal.4th 130, 174 (*Mendoza*).) In making this determination, we construe the evidence in a light most favorable to the defendant (*People v. Turk* (2008) 164 Cal.App.4th 1361, 1368, fn. 5), but speculation is insufficient to meet this requirement (*Mendoza*, at

35

p. 174).  We conduct this review de novo.  (*Waidla*, *supra*, 22 Cal.4th at p. 733.)

### B.  Imperfect Self-Defense

Imperfect self-defense and heat of passion reduce an intentional, unlawful killing from murder to voluntary manslaughter.  (*Breverman*, *supra*, 19 Cal.4th at p. 154.)  The defense "applies where the defendant believes he or she is facing an imminent and unlawful threat of death or great bodily injury, and believes the acts which cause the victim's death are necessary to avert the threat, but these beliefs are objectively unreasonable."  (*Curtis*, *supra*, 30 Cal.App.4th at p. 1354.)  However, imperfect self-defense cannot be used by a defendant whose wrongful conduct creates circumstances under which the victim's actions are legally justified.  (*In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1.)

As we previously explained, there is contradictory testimony about what occurred before the shooting began.  Palomino testified that Edgar was in the vehicle and exited it to confront him and Samaniego, asking Palomino and Samaniego where they were from.  He told the jury Edgar was wearing a big jacket.  And he said that Edgar looked like he was reaching into a pocket, where he might have had a gun.  But Palomino did not testify about any conversations he had with Samaniego in which they discussed the shooting. He did not provide any information about what Samaniego was actually thinking or whether Samaniego believed Edgar had or was reaching for a gun, or even whether Samaniego felt like his life was in danger.  And although Palomino testified that he backed away from Edgar, that does not tell the jury what Samaniego, who had a gun and may have felt differently, thought or believed.

Other testimony likewise does not shed light on whether Samaniego's actions were based on actual fear or the perceived need to act with deadly force. Aranda testified that immediately following the shooting, Palomino told him that "that fool tripped." And Edgar testified that Samaniego spoke to him first, saying "East side," which Edgar understood was a gang challenge or threat. When Edgar laughed and turned to Samaniego, Samaniego, who was five or six feet away, responded, "This is what's up," and already had a gun pointed at Edgar. Samaniego began firing shots at Edgar immediately, hitting Edgar in the chest before Edgar could get to the vehicle Alex was driving to dive through the window and escape. With no information about whether Samaniego actually believed he was facing an imminent and unlawful threat and whether he actually believed deadly force was necessary to protect himself, there was not substantial evidence to support the theory. (*Curtis*, *supra*, 30 Cal.App.4th at p. 1354.) Accordingly, the court properly declined to provide this instruction to the jury.

### C.  Heat of Passion

Murder can be reduced to voluntary manslaughter if the defendant acted in a heat of passion. This requires the victim's conduct to be "sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection"; as well as the defendant to kill while actually influenced by strong passion induced by the provocation. (*Enraca*, *supra*, 53 Cal.4th at p. 759.) The provocation can be verbal, so long as it is " 'such that an average, sober person would be so inflamed that he or she would lose reason and judgment.' " (*People v. Manriquez* (2005) 37 Cal.4th 547, 585-586 (*Manriquez*).) In addition to this objective component, the defendant must also actually and subjectively kill under a heat of passion. (*People v. Steele* (2002) 27 Cal.4th 1230, 1252.)

37

Samaniego argues that the same evidence supporting his claim for imperfect self-defense supports a heat of passion instruction, that a reasonable juror could have believed Edgar taunted Samaniego and acted aggressively, that Edgar's conduct actually angered Samaniego, that an ordinary person would have reacted with passion, and that Samaniego reacted from passion.

He takes the position that he merely needs to show that he felt any " ' " '[v]iolent, intense, high-wrought or enthusiastic emotion.' " ' " (*Breverman, supra,* 19 Cal.4th at p. 163.)  And he cites to *People v. McCowan* (1986) 182 Cal.App.3d 1, 15, a case in which the defendant "became enraged" when his ex-wife made an obscene gesture as he drove by, and that prompted him to shoot her.  But *McCowan* is not helpful to Samaniego because there is not substantial evidence that either an ordinary, reasonable person would have become impassioned in this situation or that Samaniego actually was.

Assuming the events occurred as Palomino described in his testimony, that the vehicle U-turned in the street in front of him and Samaniego and Edgar stepped out of the vehicle "saying stuff," that does not explain why that would create a violent or intense response from the ordinary, reasonable person.  (See *Manriquez, supra,* 37 Cal.4th at pp. 585-586 [reasonable people do not become homicidally enraged by verbal taunts, profanities, and challenges]; *People v. Avila* (2009) 46 Cal.4th 680, 706-707 (*Avila*); *Enraca, supra,* 53 Cal.4th at p. 759 [insults and gang-related challenges induce insufficient provocation to require heat of passion instruction].)  There is no evidence that Palomino himself felt such intense emotions, or that he lost all reason and judgment; in fact, he testified he backed away.

There is also no testimony that shows Samaniego felt any intense emotion inducing him to react in a violent or passionate manner. (*Mendoza, supra,* 24 Cal.4th at p. 174 [speculation does not warrant instruction].) Even

taking into consideration that an obscene gesture or taunting words could induce such rage to warrant this instruction, there is scant evidence that Edgar did either of these things.

## D. Harmless Error

Finally, even were the omission of these instructions erroneous, any error would be harmless. Given the evidence before the jury, there is no reasonable probability Samaniego would have received a more favorable verdict had the court instructed the jury on voluntary manslaughter. (*Watson*, *supra*, 46 Cal.2d at pp. 836-837.) The jury convicted Samaniego of premeditated and deliberate attempted murder and murder, thereby implicitly rejecting any version of events that indicated heat of passion or any sudden response to the situation. (*People v. Wharton* (1991) 53 Cal.3d 522, 572 (*Wharton*) [premeditation and deliberation finding "manifestly inconsistent with having acted under heat of passion"].)

## VI.

## ADOPTIVE ADMISSIONS

### A. Additional Facts

The People moved in limine to offer statements Samaniego made to Jessica during a telephone call from jail. Jessica told Samaniego that her dad said if Samaniego could look at him and tell him 100 percent that Samaniego did not do it, her dad would pay for the lawyer. Samaniego replied, "Yeah, you know, but . . . even it's a yes or no, it's a lot of money. It's a lot of money, you know. I'm in here, you're . . . you know, you're guilty till proven innocent here. That's all it is. And, and it's not the first time I'll get through. It's the third time." When Jessica was asked if she understood his response to insinuate guilt, she replied, "Not at all."

40

Before closing arguments but after the court had already instructed the jury, the People asked for adoptive admissions instruction, and the court said it did not disagree that it probably was arguably an adoptive admission, but they should have dealt with it the previous day. It was not going to re-read the instructions, but it would not prevent the prosecutor from arguing the statements were adoptive admissions.

The People played a portion of the conversation between Samaniego and Jessica and argued the conversation showed consciousness of guilt because Samaniego did not say he was not the shooter. The defense told the jury that the conversation between Jessica and Samaniego was not an adoptive admission; she did not understand his comment to be an admission, and the jury should not either.

The jury requested transcripts from these conversations with Jessica.

## B. Legal Principles

Under Evidence Code section 1221, a statement offered against a party is not inadmissible hearsay if the party manifests his or her adoption of the statement, with knowledge of the content of the statement. (*People v. Carter* (2003) 30 Cal.4th 1166, 1196 (*Carter*).) An adoptive admission occurs when the defendant participates in a private conversation in which the crime is discussed, and the defendant has an opportunity to deny responsibility but fails to do so. (*People v. Davis* (2005) 36 Cal.4th 510, 535.) An evasion or silence is a typical reply for such an admission. (*People v. Charles* (2015) 61 Cal.4th 308, 322 (*Charles*).) A defendant may not want the instruction because giving it "might cause the jury to place undue significance on bits of testimony that the defendant would prefer it not to examine so closely." (*Carter*, at p. 1198.) "[A]s the Evidence Code makes clear, courts are *required* to so instruct only at a defendant's request" when there is substantial

41

evidence to support it. (*Ibid.*) Additionally, a trial court may give the adoptive admissions instruction, whether or not requested, if it believes the instruction will be helpful to the jury, and it may do so over the defendant's objections. (*Charles*, at p. 331.)

We review instructional errors de novo. (*Waidla*, *supra*, 22 Cal.4th at p. 733.)

### C. Analysis

Although a court is required to give the adoptive admission instruction at a defendant's request, the law does not require it to do so upon request by the People. In those circumstances, the court *may* give the instruction if it believes doing so will help the jury. (*Charles*, *supra*, 61 Cal.4th at p. 331; see Evid. Code, § 1221.) Here, the instruction was not requested by Samaniego, so the court was not required to provide it.

Samaniego argues this decision was erroneous because the prosecution argued the exchange was an adoptive admission, and the jury was unaware of the requirements for an adoptive admission. But Samaniego does not explain why the label of adoptive admission in the instant case affected the result. "The instruction is largely a matter of common sense--silence in the face of an accusation is meaningful, and hence may be considered, only when the defendant has heard and understood the accusation and had an opportunity to reply." (*Carter*, *supra*, 30 Cal.4th at p. 1198.)

Here, with or without the instruction, the circumstances call into doubt the weight or significance of Samaniego's response to Jessica as an adoptive admission. The call took place while Samaniego was on a recorded jailhouse phone line, which Samaniego knew was being recorded. So, he may not have felt like he could speak freely. And his admission was neither a direct admission nor silence. He told Jessica that paying for an attorney was

expensive. He believed the system already viewed him as guilty, so he was not sure the money would matter. Defense counsel argued the context of the exchange showed it did not indicate any consciousness of guilt -- and the person making the statement did not view Samaniego's response as demonstrating guilt. The jury had before it the information it needed to assess whether the exchange was evidence of guilt, so it is not evident that the instruction would have aided the jury in a meaningful way.

VII.

WEIGHT OF EYEWITNESS TESTIMONY

A. Additional Facts

At trial, Edgar testified that he was positive Aranda did not shoot him, and he identified Samaniego as the shooter. The prosecutor asked Edgar what made him believe Samaniego was the shooter, and Edgar responded, "He aged a little bit, but he's the same guy. That's him. I remember him."

The defense challenged Edgar's memory: "As you sit here today, I mean, it's been 18 years, right?" And Edgar replied, "I remember that face. When somebody has a gun in your face, yeah. Somebody is trying to kill you, yeah, I remember that face." Then defense counsel challenged Edgar's focus at the time of the shooting: "And the gun was in your face. Is it fair to say that your attention was drawn to the gun?" Edgar responded, "It was drawn to the shooter and the gun." Edgar testified on cross by defense counsel, "I remember who shot me, and he's sitting here."

On redirect, the prosecutor asked: "You said that you definitely saw the defendant here, Mr. Samaniego, with a gun in his hand shooting you, correct?" Edgar replied, "Yes." The prosecutor queried, "And as you sit here

today, there's no doubt in your mind that this defendant is the person that shot you and shot your friend in the car, Alex [ ]?" And Edgar answered, "Yes."

The court instructed the jury with CALCRIM No. 315, which provides a list of factors to consider in determining whether an eyewitness's identification is accurate.[5] It also instructed the jury with CALCRIM No. 332, directing the jury to consider the opinions of the expert who testified about memory and the accuracy of identification.

---

[5] CALCRIM No. 315 was modified to exclude some factors. The jurors were instructed to consider the following factors in evaluating the identification testimony:

- "Did the witness know or have contact with the defendant before the event?
- How well could the witness see the perpetrator?
- What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance, [and] duration of observation?
- How closely was the witness paying attention?
- Was the witness under stress when he or she made the observation?
- Did the witness give a description and how does that description compare to the defendant?
- How much time passed between the event and the time when the witness identified the defendant?
- Was the witness asked to pick the perpetrator out of a group?
- Did the witness ever fail to identify the defendant?
- Did the witness ever change his or her mind about the identification?
- How certain was the witness when he or she made an identification?
- Are the witness and the defendant of different races?
- [Was the witness able to identify other participants in the crime?]
- [Was the witness able to identify the defendant in a photographic or physical lineup?]
- Were there any other circumstances affecting the witness's ability to make an accurate identification?"

44

Samaniego challenges the trial court's use of CALCRIM No. 315, arguing his convictions should be reversed because Edgar's certainty during his in-court identification was crucial to a guilty verdict and was an improper factor for the jury to consider. We review challenges to jury instructions de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

Our Supreme Court recently addressed this issue in *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*). *Lemcke* held that listing the witness's level of certainty among the factors a jury considers under CALCRIM No. 315 to evaluate eyewitness identifications does not render a trial fundamentally unfair or otherwise amount to a due process violation. (*Lemcke,* at pp. 647, 660-661.) Nothing in the instruction operates "to 'lower the prosecution's burden of proof' " because "the instruction does not direct the jury that 'certainty equals accuracy.' [Citation.]" (*Id.* at pp. 647, 657, 658.)

The defendant in *Lemcke* presented a rigorous identification defense, his counsel cross-examined investigating officers to explore problematic aspects of identification procedures, and he called an eyewitness expert who "testified at length about the weak correlation between certainty and accuracy, particularly with respect to in-court identifications." (*Lemcke*, *supra*, 11 Cal.5th at p. 660.) In the end, although the court acknowledged that "an enhanced or modified version of the certainty instruction might well be advisable," it explained that the inclusion of witness certainty as a factor for jurors to consider nonetheless did not establish a due process violation. (*Id.* at p. 661.)

The case before us is comparable. Like the defendant in *Lemcke*, Samaniego presented a rigorous defense challenging his identification as the shooter, challenging the credibility of witnesses, and noting the lack of physical evidence connecting him to the scene. Samaniego offered expert

testimony to challenge the accuracy of an in-court identification, the type he now contends was problematic. And his attorney questioned the credibility of various witnesses. Further, the jury was instructed that the People bore the burden of proving beyond reasonable doubt that it was the defendant who committed the crime (CALCRIM No. 315) and that it was required to consider the expert's testimony (CALCRIM No. 332). And the prosecutor reiterated the People's burden of proof in closing arguments. These actions helped ensure fairness.

We recognize that the Supreme Court has directed trial courts to omit the certainty factor from CALCRIM No. 315 going forward, until the Judicial Council can consider how the language might be better worded to minimize any possible juror confusion on that point. (*Lemcke*, *supra*, 11 Cal.5th at pp. 668-669.) However, "nothing in CALCRIM No. 315's instruction on witness certainty operates to 'lower the prosecution's burden of proof.'" (*Id.* at p. 657.) It leaves it to the jury to decide the credibility of a witness's level of certainty and what weight to assign the certainty. (*Ibid.*) Additionally, nothing in CALCRIM No. 315 suggests to a jury that it should ignore expert testimony regarding witness certainty. (*Id.* at p. 658.)

Here, like in *Lemcke*, other instructions undercut the claim that the certainty language lowers the burden of proof. (*Lemcke*, *supra*, 11 Cal.5th at p. 658.) The court instructed the jury that Samaniego was presumed innocent and that the prosecution bore the burden of proving the crimes beyond a reasonable doubt, and CALCRIM No. 315 states that the People bear the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. Under these facts, the reference to witness certainty was not error.

46

## VIII.

## CLOSING ARGUMENTS

Samaniego contends the prosecutor's closing arguments improperly sought an outcome based on juror passion and sympathy for the victims. He also contends that it was improper for the prosecutor to ask the jurors to find justice for the victims by holding Samaniego accountable for his actions with a guilty verdict.

### A. Forfeiture

As a preliminary matter, we agree with the People that the defendant forfeited his claim of prosecutorial misconduct because he failed to " 'make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety. [Citations.]' " (*Clark, supra*, 52 Cal.4th at p. 960, quoting *People v. Cole* (2004) 33 Cal.4th 1158, 1201 (*Cole*); see also *People v. Dennis* (1998) 17 Cal.4th 468, 521 (*Dennis*).)

### B. Specific Instances of Prosecutorial Misconduct

Even if we were to determine the claims were properly before us, we would conclude they fail on the merits.

"A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.] A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' [Citations.]" (*Cole, supra*, 33 Cal.4th at p. 1202.)

Still, prosecutors have wide latitude during closing argument to argue vigorously. (*People v. Harrison* (2005) 35 Cal.4th 208, 244 (*Harrison*).) We will not reverse a conviction for prosecutorial misconduct "unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct." (*People v. Crew* (2003) 31 Cal.4th 822, 839 (*Crew*).) " '[A] prosecutor may not invite the jury to view the case through the victim's eyes, because to do so appeals to the jury's sympathy for the victim.' " (*People v. Leon* (2015) 61 Cal.4th 569, 606, quoting *People v. Leonard* (2007) 40 Cal.4th 1370, 1406.)

Additionally, referring to facts not in evidence constitutes misconduct because it tends to make a prosecutor his or her own witness, " 'offering unsworn testimony not subject to cross-examination.' " (*People v. Hill* (1998) 17 Cal.4th 800, 828 (*Hill*).) However, prosecutors can discuss and draw inferences from evidence. (*People v. Lucas* (1995) 12 Cal.4th 415, 473.) And "[w]hen the issue 'focuses on comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' [Citations.]" (*Harrison*, *supra*, 35 Cal.4th at p. 244.) We "view the statements in the context of the argument as a whole." (*Cole*, *supra*, 33 Cal.4th at p. 1203.)

### 1. *References to Justice*
#### a. Additional Facts

Several times throughout the closing argument, the prosecutor told the jury the case was about getting justice. After asking the jurors to come to a "reasonable and just decision," he told them the case was really about "finding justice and finding the truth and finding closure for Alex [ ]." He said the case was Alex's "opportunity to be heard through the evidence and

his opportunity to find justice . . . ." He continued: "It's also about Edgar . . . . This was his opportunity to take that stand and get justice and to be heard. And that's what really this case is all about. When it's over, from the beginning until the end, that's really what it's about."

The prosecutor told the jury: "[W]hat's sad about cases like this is they are dirty. They're not like what you would like to see. There's no DNA. There's no video. There's nothing there. But do we just throw away cases like that and say, well, we don't have that, so let's not follow up with tips we get from crime stoppers or from confidential informants because they're dirty or they're not clean like DNA? Or do we want to find justice?"

Near the end of his closing argument, referencing Aranda and Palomino as cooperating witnesses, the prosecutor said, "If you believe that we gave the other two a deal that is way too sweet, that's on me. That's on my office. That's not on Edgar [ ]. That's not on Alex [ ]. So even if you believe that, don't just throw out everything because you think we screwed up, which we didn't. But don't let the defense convince you of that because that's not justice. That's not teaching anybody a lesson. You're not teaching the government or the people a lesson. You're punishing Edgar [ ] and you're punishing Alex [ ]."

In his rebuttal, after explaining why the People concluded it was not Aranda or Palomino who shot Edgar and Alex, the prosecutor explained, "We're trying to find the truth. We're trying to find what's going on. . . . We're looking for the shooter in this case. We want justice, and that's what happened."

Near the end of his rebuttal, the prosecutor concluded: "So as I started and I will end you with, if you look at all the evidence and you look at it in a reasonable manner, and you—and you realize what we're here to do—and as

49

I started, I said we're here to find justice.  We're here to find the truth.  We're here to find the truth for Edgar [ ] and we're here to find the truth for Alex [ ].  That's what we're doing.  That's what this case is about is hearing their voices and finding the truth and holding the defendant accountable for what he did and what happened in this case."

### b.  Analysis

Viewed in the full context of the closing argument, the prosecutor's comments did not rise to a level of denying Samaniego the right to a fair trial.  The prosecutor did not rely on passion to persuade the jury about Samaniego's guilt.  He asked the jury to be reasonable in its evaluation of the evidence and its decision-making.  He told the jury the People bore the burden of proving Samaniego's guilt beyond a reasonable doubt, and the People had to prove that Samaniego did not act in self-defense.  The prosecutor spent the vast majority of the closing arguments explaining why the evidence supported the People's theory that Samaniego was the shooter, discussing the elements of the various charges against the defendant, explaining why the jury should conclude Samaniego acted with the required malice aforethought, and why the shooting was deliberate.  He acknowledged the conflicting stories presented by Edgar and Palomino and argued why the jury should believe Edgar.  The prosecutor explained why the evidence pointed to Samaniego as the shooter and not to one of the other witnesses, identifying the corroborating evidence and similarity of several of the witnesses' recitations of the events.

And the prosecutor's rebuttal comment that "we want justice" was made in the context of explaining that the People sought the truth and that it was Samaniego and not Aranda who shot Edgar and Alex.  Taken together, these comments show the prosecutor was requesting a just and reasonable

50

verdict based on the evidence, and it is not reasonably probable that absent these comments the jury would have reached a different conclusion.  (See *Crew*, *supra*, 31 Cal.4th at pp. 839-840.)

Although we conclude that these comments were not so impassioned or so inflammatory that they give rise to bias that prejudiced the defendant or caused an unfair trial, we disapprove of the prosecutor's references to the jury as present at the trial to "find justice."  Communities are served by jurors doing their work in a lawful, unbiased fashion.  (See *People v. Fields* (1983) 35 Cal.3d 329, 362 [appeals to passion and prejudice invite departure from duty to view evidence objectively].)  The job of "doing justice for the victim" is not the jury's.  The role of a jury is to apply to the law fairly and even-handedly to the facts, whether this leads to a conviction or an acquittal.

### 2.  *References to Crime Stoppers*

#### a.  Additional Facts

While discussing how Detective Adams came into the information that led to reopening the case, the prosecutor explained that she got her information from confidential informants.  The prosecutor said that a juror might think, " 'I don't like this whole confidential informant thing, you know?  This doesn't sound right.' "  But "That's what we have.  We have Crime Stoppers.  We have different things where people can call in and can anonymously give information.  And think about this.  This is a case where people know what happened, but nobody can talk about it.  So, in order to find justice, in order to get the voice for the victims in this case, we have to listen to voices of people that don't want to get involved.  And that's what gets them on the radar.  That's what gets Palomino—and that's where Palomino's name comes up. . . ."

51

### b.  Analysis

The prosecutor did not tell the jurors the information used to solve the crime came from an anonymous caller to Crime Stoppers.  He referred to Crime Stoppers as one example of the types of anonymous information police relied on to solve some crimes.  And he did this in the context of explaining that police relied on anonymous or confidential sources when investigating crimes in a community where the public was reluctant to share information with police for fear of retaliation, as was the case here.  He also made the reference to rebut the implication that the information was inaccurate because of its confidentiality or anonymity, commenting that tips from Crime Stoppers or confidential informants might be "dirty," but they were necessary.  The prosecutor did not misstate the evidence on this point.

As we previously noted, even if these various statements Samaniego now complains of were to have risen to the level of misconduct, none of them was so serious that an objection and admonition would have been inadequate to cure the harm; thus, the argument is forfeited.  (*Wharton*, *supra*, 53 Cal.3d at p. 566.)  Finally, the trial court instructed the jury that arguments were not evidence, and that it was up to the jury to decide facts based on evidence.  (See CALCRIM Nos. 200 & 222.)  We presume the jury understood and followed these instructions.  (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1178.)

### IX.

### INEFFECTIVE ASSISTANCE OF COUNSEL

Samaniego alleges his attorney provided ineffective assistance of counsel for a litany of reasons, including many of the issues we addressed *ante*.  Among the remaining alleged errors by his attorney are the attorney's failure to (1) request CALCRIM No. 350 regarding defendant's character;

(2) object to Detective Adams's testimony that his photograph looked like the composite developed by Edgar; (3) object to the admission of the gunshot residue report on Aranda; and (4) object to testimony regarding confidential informants.

To demonstrate ineffective assistance of counsel, Samaniego bears the burden of demonstrating his attorney's performance (1) fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced the defense. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688.) We evaluate counsel's conduct with deference and "indulge a strong presumption that counsel's acts were within the wide range of reasonable professional assistance." (*Dennis*, *supra*, 17 Cal.4th at p. 541.)

When the alleged error is a failure to object or to act, it is difficult in a criminal case to determine why trial counsel did not do what appellant now claims was required. Defense counsel has latitude in deciding how to defend a criminal case. " ' "[If] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.' [Citation.]" (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.) Often, "such a case is more appropriately decided in a habeas corpus proceeding." (*Id*. at pp. 266-267.)

While we do not know specifically why Samaniego's attorney made the strategic decisions he did, we do not conclude that they clearly or obviously demonstrated ineffective assistance. For example, we can glean that he decided not to request CALCRIM No. 350 because the record does not reveal that there was substantial evidence of a character trait which would create

53

doubt regarding Samaniego's guilt. Similarly, defense counsel's failure to object to certain testimony by Detective Adams about the similarities between Samaniego's DMV photographs and the composite developed by Edgar may have been because he was challenging that action by arguing the photographs were not actually all that similar, using testimony from the expert to make this point. We simply do not know on this record why defense counsel made the strategic decisions he did, and we are not inclined to speculate.

If Samaniego has a remedy for this claim, it is by a separate habeas corpus petition in the trial court, and we note no such companion petition was filed in this matter.

## X.

## CUMULATIVE ERROR

Samaniego asks us to review the cumulative impact of the alleged errors previously addressed. He notes that even independently harmless errors can "rise by accretion to the level of reversible and prejudicial error" (*Hill*, *supra*, 17 Cal.4th at p. 844), and he maintains that here multiple errors have violated due process by resulting in an unfair trial (see *Chambers v. Mississippi* (1973) 410 U.S. 284, 298-303). However, rather than explain how the accumulation of harmless errors has denied due process here, Samaniego's main focus is that he was denied a fair trial because his attorney provided ineffective assistance of counsel, and the court did not replace his attorney when requested during the *Marsden* hearing process.

Because Samaniego failed to meet his burden to demonstrate ineffective assistance of counsel, the ineffective assistance of claim does not form a basis for his cumulative error charge. We concluded *ante* that most of the claims of error lacked merit, and as we explain *post*, the court did not err

in denying the *Marsden* requests. The only error we found regarded the inclusion of CALCRIM No. 3471. Even accepting this instruction as erroneously offered, the result was not prejudicial to Samaniego. Because the court committed no other error, the cumulative error doctrine has no application. (*People v. McWhorter* (2009) 47 Cal.4th 318, 377 [no cumulative error when no error]; *People v. Butler* (2009) 46 Cal.4th 847, 855 [rejecting cumulative effect claim when court found "no substantial error in any respect"].) Accordingly, we conclude there is no due process violation here. (See *People v. Holt* (1984) 37 Cal.3d 436, 458 [cumulative error claim assessed for reasonable probability of more favorable result].)

## XI.

## *MARSDEN* HEARINGS

Samaniego contends the court erred by refusing to hold one requested *Marsden* hearing and by declining to appoint new public defense counsel despite Samaniego's repeated requests.

### A. Legal Principles

Upon request, the trial court must conduct a *Marsden* hearing at which the defendant states specific reasons for the requested dismissal of counsel. (*People v. Sanchez* (2011) 53 Cal.4th 80, 89.) If the defendant fails to specify adequate reasons for the requested substitution, the court may properly deny the request. (*People v. Bean* (1988) 46 Cal.3d 919, 947-948; *People v. Silva* (1988) 45 Cal.3d 604, 622.) "A trial court should grant a defendant's *Marsden* motion only when the defendant has made 'a substantial showing that failure to order substitution is likely to result in constitutionally inadequate representation.'" (*People v. Hines* (1997) 15 Cal.4th 997, 1025; *People v. Webster* (1991) 54 Cal.3d 411, 435 (*Webster*) [court has discretion to deny

55

motion if defendant fails to show failure to substitute would substantially impair defendant's right to counsel].)

The court considers whether counsel has consulted with the defendant, failed to present a defense, adequately investigated facts and law, and whether counsel has made omissions due to inadequate preparation. (*Marsden*, *supra*, 2 Cal.3d at p. 123.) If the defendant shows " ' "appointed counsel is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result," ' " the defendant is entitled to relief. (*People v. Streeter* (2012) 54 Cal.4th 205, 230.)

Inadequate representation exists when counsel has a conflict of interest that undermines the attorney's duty of loyalty to the client or there is an actual conflict that affects the attorney's performance. (*People v. Doolin* (2009) 45 Cal.4th 390, 417.)

Disagreements about trial tactics are insufficient to demonstrate an irreconcilable conflict. (*People v. Alfaro* (2007) 41 Cal.4th 1277, 1320 (*Alfaro*).) Lack of rapport or a breakdown in communication likewise are insufficient to demonstrate an irreconcilable conflict; otherwise, defendants " ' "effectively would have a veto power over any appointment" ' " leading to eventual appointment of preferred attorneys, which is not the law. (*People v. Memro* (1995) 11 Cal.4th 786, 857.) The failure to file a motion that the attorney determines is futile also does not establish a constitutionally deficient performance. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 804-805.)

"We review the denial of a *Marsden* motion for abuse of discretion." (*People v. Taylor* (2010) 48 Cal.4th 574, 599.) There is no abuse of discretion " 'unless the defendant has shown that a failure to replace counsel would

substantially impair the defendant's right of assistance of counsel.' [Citation.]"  (*Ibid.*; *People v. Mungia* (2008) 44 Cal.4th 1101, 1128.)

### B.  The Marsden Hearings

### 1.  *June 8, 2016 Hearing*

Samaniego told the court he had a conflict of interest with his court-appointed attorney because he had requested full discovery numerous times over the preceding eight months and his attorney had not provided it to him. The full discovery was mostly audio tape, and the attorney was playing the recordings for him, but Samaniego wanted transcripts.  Samaniego also wanted more than a month to review written transcripts to be prepared for the preliminary hearing.

Samaniego told the court that his attorney had lied because the attorney knew one codefendant had become a cooperating witness and when asked where that person was housed, his attorney said he did not know.

Samaniego did not believe his attorney was qualified or experienced enough for such a "big" and "high-profile" case.

Finally, Samaniego accused his attorney of doing everything last minute instead of when he was directing his attorney to act, and he complained that his attorney did not want to subpoena all the witnesses, which was what Samaniego wanted to do.

Defense counsel told the court the district attorney had taken six weeks to share discovery, and that he had spoken with the prosecutor numerous times before he eventually received it.  The discovery was complicated by codefendants who had become cooperating witnesses and by the involvement of confidential informants, necessitating redaction of some material.  The prosecutor's office had not transcribed the audio, so his office was transcribing the relevant witness audio, but it was time-consuming.  As his

office finished transcribing the relevant portions, he was giving copies to Samaniego, and Samaniego would have an opportunity to listen to all the relevant audio information before the preliminary hearing.

Samaniego's counsel told the court he had been completely candid with his client; no one informed him the former codefendants would be cooperating, and at the time he discussed the codefendants with Samaniego, he believed both were in custody.

Defense counsel detailed his experience as a public defender over the course of approximately a decade, during which time he had handled thousands of cases and taken 50 cases to jury trial, including cases with serious crimes.

Defense counsel told the court that he had a difference of opinion regarding subpoenaing every possible witness, and that was a strategy decision. He also said he had personally interviewed witnesses and tried to talk with anybody with information about the case.

The court denied Samaniego's motion, outlining its belief that defense counsel was providing more than adequate representation. It concluded there was no credible evidence that defense counsel had lied to Samaniego, and it was not uncommon for the district attorney's office to take actions like persuading codefendants to become cooperating witnesses without informing defense counsel. It found that defense counsel had spent time with Samaniego and catered to some of Samaniego's requests, including transcribing audio recordings. The court told Samaniego the attorney's decision not to call all of the witnesses at the preliminary hearing was a strategic choice based on counsel's 10 years of experience, and it commented that it could hurt the case to call all the witnesses at the hearing.

58

The court also found that defense counsel was not unqualified simply because he had never sat first chair at a murder trial; the attorney had participated in such trials as second chair and had handled other cases involving violence.

Ultimately, the court determined there was no conflict between Samaniego and his attorney; if there were a conflict, it was not irreconcilable, and if it were irreconcilable, the court did not believe it would likely result in ineffective representation.

## 2. *July 27, 2016 Hearing*

Samaniego asked for his attorney to be replaced because defense counsel gave him paperwork late and told Samaniego he was seeking an extension of time because he wanted to go on vacation. Samaniego had told his attorney he needed the transcripts as soon as possible, and he still had not received two transcripts that he wanted before the preliminary hearing.

Defense counsel had only visited him four times in the previous two months, and he never stayed longer than an hour. The investigator had visited maybe five times, but only for about 45 minutes each time, and he did not always have the right equipment or bring Samaniego new transcripts. Samaniego believed defense counsel was too busy for his case; he wanted an attorney who would meet with him at least twice a week for two or three hours each meeting. He did not feel ready for the preliminary hearing because he had not received all the transcripts.

Defense counsel responded that he took a two-week vacation that had been planned eight months earlier and was unrelated to the continuance he requested. He was on vacation during the time period Samaniego referenced regarding his number of visits, and his investigator had visited Samaniego lots of times. Samaniego had not asked him to visit more frequently, or he

would have, but he had done a lot of work "behind the scenes."  It was not that he was not spending time on the case; he was spending it driving to various locations to interview witnesses.

His office was completing transcripts, and he provided them to Samaniego as they were completed.  He had given Samaniego everything he had received from the district attorney's office.  He was prepared and ready to move forward with the preliminary hearing that day, and he did not believe there was any reason he and Samaniego could not work together.

The court said that Samaniego's allegations that his attorney was not properly representing him fell flat; defense counsel was prepared as much as he could be.  The court denied the motion.

### 3.  *September 7, 2016 Hearing*

Samaniego claimed a conflict of interest with his attorney because his attorney had not supplied him with paperwork he had been requesting from the beginning.  Samaniego wanted transcripts of audio recordings.

Defense counsel had requested from the district attorney's office any audio he had not yet received, and his office was in the process of transcribing a lot of the audio recordings they had, which was very time-consuming.  He said if they did not feel prepared for trial in April, the district attorney would work with them on another trial date.

The court denied the motion.

Samaniego then told the court he wished to proceed in propria persona.  The court advised against it and asked Samaniego if he wanted time to think about it.  The court said it would not appoint an attorney to help him

represent himself and continued the potential *Lopez*[6] hearing for a week to give Samaniego time to consider his options.[7]

### 4. *April 11, 2017 Hearing*

Samaniego alleged his attorney was providing ineffective assistance because he had not provided a written transcript for every audio recording and because Samaniego was not present at the trial readiness conference. He also complained that his attorney did not want to hire a gun expert or a crime scene reconstruction analyst, a forensic evidence expert, or a false statement expert. Samaniego did not trust his attorney, who had not visited in a long time, and he asked the court to appoint a different attorney. He told the court he had fired his court-appointed attorney on April 3.

Defense counsel explained that Samaniego wanted some cell recordings and audio recordings that his office did not have but had requested, and he did not know how relevant those recordings were. He did not believe the prosecution planned to use them. He explained that when Samaniego requested a transcript of an audio recording, he made the request, and his office did its best to meet the request, providing them to Samaniego as they were completed. The defense attorney was fully prepared for the preliminary hearing and felt it went well. It proceeded because there was no legal basis for a continuance. He explained that the expert witness decisions were strategic ones; he did not believe the specific experts Samaniego wanted would assist in the case, and if there were an expert who would assist, he would consider using that person.

---

[6]    *People v. Lopez* (1977) 71 Cal.App.3d 568 [court ensures defendant understands right to appointed counsel at no cost].)

[7]    Samaniego withdrew his request for a *Lopez* motion.

Defense counsel also relayed his activities in the matter: although he was prevented from speaking to the two cooperating witnesses, he visited prison three times to locate potential witnesses, and he interviewed numerous witnesses and other parties involved. He was involved in researching issues related to the recent passage of Proposition No. 57, which was applicable to the matter.

The court acknowledged Samaniego's frustrations and commented that the case was complicated by being a cold case. It acknowledged that Samaniego seemed to believe his attorney did not have his best interests at heart, but commented Samaniego's dissatisfaction seemed subjective. The discovery was slow because of safety concerns, and some of the experts Samaniego was requesting could do damage to the case, so the defense had to be strategic about which experts to use. The court asked Samaniego to show more patience because his attorney had his best interests at heart, was doing a fine job, and was an experienced attorney. It concluded that defense counsel had properly represented the defendant and commented that there had "not been a breakdown in this relationship of such a kind that make it impossible for [defense counsel] to continue." The court denied the motion.

5. *December 8, 2017 Hearing*

Samaniego said he still had not received all the discovery. He complained that when he told his attorney he wanted to discuss the case, defense counsel would say he was too busy and refuse to visit. He could not talk with his attorney on the phone because he was in administrative segregation.

Defense counsel responded that he had a reasonable case load and tried to visit Samaniego as often as possible, but he could not see his client as frequently as his client wanted. He had made numerous requests for certain

62

discovery to the district attorney, and there were about 2,000 pages, with portions blacked out. He had gone through each page with the district attorney, and the district attorney believed the redacted items were not discoverable. There had been a pause in the case since the passage of Proposition No. 57 the previous year, but he had interviewed every witness willing to talk.

The court denied the motion, telling Samaniego that he had not stated sufficient grounds for a new attorney based on the subjective feeling that things were not happening in his case when a lot was occurring. The court also commented that defense counsel was a "resident expert" on Proposition No. 57, which was going to be the most critical thing at the next phase of the case.

6. *August 17, 2018 Juvenile Hearing*

Samaniego challenged the timing of the juvenile transfer hearing because he had not received everything from his attorney, and he would not have enough time to prepare because each time his attorney visited, the attorney wanted to leave.

The court told Samaniego the removal hearing was to decide whether he would be moving through the juvenile system or the adult system. It asked defense counsel if he felt he would not be prepared to proceed with the removal hearing in October, and defense counsel said he would be prepared.

Samaniego again said he was tired of the case moving forward when he did not feel personally prepared, but the court said two months was enough time for the parties to be ready to proceed. It explained that additional time would not add to the case.

Defense counsel gave his word that he would meet with his client to review his strategy for the juvenile transfer hearing, and he told the court

63

they had subpoenaed some records from the Sheriff's Department that were still incomplete.

### 7. *October 15, 2018 Hearing*

After the case was transferred to juvenile court for a Proposition No. 57 hearing, Samaniego moved to replace his counsel. He said his attorney was incompetent by failing to make a section 995 motion to dismiss all the allegations after arraignment. Samaniego had asked his attorney to seek a bail reduction or ask for a release on his own recognizance, and the attorney had done neither. He told the court his attorney rushes when they visit.

The court explained that the jurisdictional issue had to be determined before any of the motions Samaniego wanted his attorney to file could be filed, and he was appearing in juvenile court so the court could make a jurisdictional decision because he was 17 at the time of the crime. It explained that defense counsel had a lot of witnesses lined up to testify on Samaniego's behalf at the jurisdictional hearing, and in the court's view, defense counsel had "done everything he could do to get this case prepared for this removal hearing."

Samaniego told the court he believed defense counsel's briefing was missing information, and that the attorney had decided what to put in the papers without sharing the briefs before they were filed. He said his attorney and the attorney's supervisor had been pressuring him to sign a plea agreement.

Defense counsel explained that he discussed potential plea bargains with Samaniego, as well as negotiation tactics, and his supervisor participated to offer a second opinion.

The court told Samaniego that his attorney had filed a very lengthy pleading, and the brief raised every possible issue that could be raised. It

64

understood Samaniego wanted to focus on whether he was guilty beyond a reasonable doubt, but that was not considered in the juvenile court hearing, where the issue was whether the case should be litigated in juvenile court or adult court. And the court said defense counsel was required to address a potential plea with his client and told Samaniego it would be rare in a case involving a murder charge for an attorney not to discuss that possibility. The court suggested Samaniego cooperate with his attorney and denied the motion.

### 8. *December 4, 2018 Hearing*

Samaniego told the court he had "a big conflict of interest" with his attorney; he did not want to talk to his attorney or his office. He did not receive paperwork before the Proposition No. 57 hearing, and his attorney had omitted information from the briefing before the juvenile court that he thought should have been included. Samaniego complained that the juvenile court placed a lot of weight on the victim being shot in the back, which he said was factually inaccurate because the bullet lodged in Edgar's back, but Edgar was not shot in the back.

The court pressed Samaniego about the juvenile court briefing. Samaniego wanted his attorney to highlight the fact that one of the confidential informants did not name him as a shooter, just placed him at the scene. He told the court he was very unhappy with what counsel presented in juvenile court; he wanted that court to know he had been working before the arrest, and that he voted three years in a row. He was upset the juvenile court considered an old case that he pled guilty in, and he wanted his attorney to tell the court that the victim in that case was not hurt that badly even though he was charged with great bodily harm. He also wanted the

65

juvenile court to understand that he was not hanging out with gang members, he was helping them because he had a moving company and they were working for him.

Samaniego wanted his attorney to ask for bail reduction or file a section 995 motion to dismiss allegations. Also, there had never been a bail review, and he was not a threat to society.

Samaniego also complained that the court he did not have a direct phone number for his attorney, that he only got his attorney's voicemail, and that his attorney had gone on vacation three or four times without telling Samaniego. When defense counsel visited, he only stayed for about an hour each visit before the attorney began checking his watch.

Samaniego also claimed that his attorney's supervisor had dropped off a package and said their office was not going to help Samaniego. Finally, he told the court the parties continued to move court dates, and he still did not have all the discovery. When asked, Samaniego clarified that there were a lot of blank pages in the discovery, and he wanted his attorney to challenge the protective order.

Defense counsel told the court he had explained his strategy to Samaniego, discussed the odds of success, and explained how juvenile jurisdiction operated differently than criminal court. He also explained that there is a presumption of guilt in determining jurisdiction in juvenile court.

After the juvenile court reinstated criminal proceedings, defense counsel's office filed a writ to challenge the decision; he had not told Samaniego about this at the time because Samaniego refused his visit.[8]

---

8       Samaniego's request for judicial notice of the petition for writ of mandate in case No. D074913 is granted.

He explained the discovery took so long because the use of cooperating witnesses necessitated redactions. Then, he began paying attention to Proposition No. 57 because there was a question of Samaniego's eligibility for a juvenile transfer. When the case was transferred to juvenile court for a hearing, defense counsel spent months preparing for the transfer hearing, and a bail reduction hearing was not available in juvenile court.

Defense counsel explained that he would consider filing a section 995 motion; he had not done so sooner because they began contemplating the juvenile transfer hearing right after the preliminary hearing.

He had previously provided Samaniego with his direct phone number.

Defense counsel said he visited Samaniego as often as he could, and the visits averaged about two hours in length. He visited Samaniego 16 times in 2018 and spoke with him approximately twice a month by phone. He told the court he did not challenge the confidential informants in juvenile court, which were validly included in the probation officer's report, but he did convince the juvenile court to strike some of the informants' statements as lacking credibility.

The attorney's supervisor went to see Samaniego while defense counsel was on vacation. He could not imagine his supervisor telling Samaniego that his office would not help Samaniego, but it was possible he said that what Samaniego wanted done was not feasible.

Additionally, information from confidential informants was not used at the preliminary hearing; witnesses testified about what they observed or heard from Samaniego, and Samaniego had reports about what the witnesses would say. He had asked the district attorney about the redacted pages, and he could still challenge the information if it was important.

67

Defense counsel said he was "ready, willing, and able to take this case on," that he had about 20 presenting cases, but that he was in the best position to help Samaniego.

The court explained that bail review requests were not common in certain instances because it makes the case more public and harder to seat an impartial jury. It asked if the conflict about which Samaniego was complaining was that his attorney was doing things Samaniego did not like and commented, "In other words, he doesn't do it your way."

The court explained that a defendant cannot select a particular appointed attorney; there has to be a legal basis for relieving defense counsel, and none existed. While Samaniego could retain a private attorney, there was no legal basis under *Marsden* to justify substituting a different attorney. Samaniego said he did not trust defense counsel because he had lied "numerous times," telling him he would request bail reduction or release on his own recognizance. He also said his attorney had lied about planning to visit him and agreeing to take into consideration Samaniego's ideas.

9. *Denial of* Marsden *Hearing January 16, 2019*

On January 16, 2019 at a status conference, Samaniego requested another *Marsden* hearing. The court said it could see there had been at least five *Marsden* hearings denied, the most recent one five weeks earlier. It denied the request for the hearing, explaining, "I don't think it would be fruitful, and it would be a waste of court time and resources as well as the attorney's time and resources."

Samaniego told the court there was a conflict of interest between him and defense counsel, and he did not want the proceeding to go forward. The court said it was not going to stop the proceedings, it was denying the request for a *Marsden* hearing.

68

### 10. *March 4, 2019 and March 8, 2019 Hearings*

About six weeks later, Samaniego told the court his attorney was ineffective because he would not submit a second writ petition to challenge the outcome of the juvenile hearing. He wanted defense counsel to seek a bail reduction hearing, and defense counsel had not. Samaniego was upset his attorney had not filed any motions, like a section 995 motion, and his attorney was not objecting to anything. Samaniego said no one from the public defender's office came to see him anymore, and when he asked his attorney to visit, the attorney said he could not make it. And Samaniego complained that too much of the discovery was redacted and said the district attorney withheld information from the juvenile hearing that would have helped him. He told the court that defense counsel had failed to prove he was 17 at the time of the alleged crime, and his attorney just did whatever he wanted; he did not trust his attorney.

Defense counsel explained that the appellate court had denied the writ. He told the court he did not seek the bail reduction because sometimes the court would increase the amount of bail and did not believe it was worth the risk. He explained there was no obligation to file a section 995 motion, and he did not believe one was warranted because a cooperating witness had testified at the preliminary hearing, which was enough to bind the case over for trial. He visited Samaniego upwards of 20 times in 2018, each meeting at least an hour in duration. He addressed the redacted pages with the district attorney, and nothing relevant to the case had been blacked out. Defense counsel also noted that there is a presumption of guilt in juvenile court, and that the whole reason they were before the juvenile court was because Samaniego met the age requirement.

69

The court told Samaniego his case was a complicated one, with extensive motion work. The court said that a bail reduction hearing could go either way, the appeal of the juvenile court's decision had been denied, and defense counsel had visited him. The court also explained why a section 995 motion may not have been the best strategy and why Samaniego was not entitled to the redacted information. The court denied the motion.

At that point, Samaniego asked the court for a waiver to represent himself. In a follow-up hearing, Samaniego told the court his attorney had been "stepping all over [him]," and he could not let that happen anymore. The court said it would give Samaniego a couple weeks to consider whether he wanted to represent himself. Although the court did not think it was in Samaniego's best interest, it would allow him to do so.

### 11. *Pretrial Complaints*

On March 22, Samaniego told the court he did not want to represent himself, but he had a conflict of interest with his attorney because defense counsel failed to call helpful witnesses at the juvenile hearing, and they had never been on the same page. He asked the court for standby counsel, and the court told him the county did not have standby counsel, so he would be on his own. The court explained there were no grounds to fire his attorney, so he could retain defense counsel or represent himself. Samaniego said he would represent himself if he could not have a different lawyer.

Defense counsel did not believe there was a legal conflict between them, and he knew the case better than anyone in the courtroom.

Samaniego said he was not sure what to do, and the court offered him some additional time to think about it. The court set a hearing for April 12.

On April 12, Samaniego said he did not want to represent himself, but he wanted to present a letter, which the court received into evidence. The

letter detailed Samaniego's dissatisfaction with his attorney. It stated that he wanted to communicate with his attorney three times a week to discuss motions and defense strategy. To ensure that occurred, his attorney needed to persist in calling him because of Samaniego's limited access to the phone. He expressed what plea deal he would be willing to accept and stated that defense counsel should not waste his time by presenting any other offers. He concluded with a statement that he needed all exculpatory evidence and full discovery.

On July 8, at the end of a hearing, Samaniego told the court that there was still a conflict between him and his attorney and the investigator. The court responded, "Okay."

12. *July 31, 2019 Hearing*

Samaniego told the court his attorney saw him four times in the previous month or two, but they did not discuss jury instructions or what the defense strategy would be. He wanted defense counsel to request instructions for involuntary and voluntary manslaughter, but his attorney had not. He was also upset because his attorney asked him to sign a plea deal.

Defense counsel reported that he would ask for voluntary or involuntary manslaughter, but it would be up to the court and depend on the state of the evidence. He explained the contract was a statement about what Samaniego was willing to offer. The district attorney had agreed to accept a nine-year stipulated offer, but Samaniego had turned that down.

The court told Samaniego it appeared that the defense attorney was working hard and in Samaniego's best interest. It denied the motion.

## C. Denial of Motions Did Not Abuse Discretion

Samaniego contends the court erred in denying each of the *Marsden* motions because his attorney performed inadequately outside the courtroom and because his attorney failed to adequately prepare for trial and the juvenile court fitness hearing. He maintains that the record demonstrates his attorney failed to "investigate and present evidence that was significant to the key issues in his case and his fitness hearing." He further argues that he told the court he did not trust his counsel and that he "disagreed on defense strategy" because he wanted alternative defenses presented, not just a misidentification defense. And he contends that none of the *Marsden* hearings rectified his dissatisfaction or distrust over the lengthy period of the attorney client relationship; he never found his attorney's representation was effective.

Samaniego must show that the court abused its discretion in denying his motions with evidence presented to the court to demonstrate that his attorney was not providing adequate representation or that he and defense counsel were embroiled in such an irreconcilable conflict that the result would be ineffective assistance. (*People v. Jones* (2003) 29 Cal.4th 1229, 1244-1245.) But Samaniego does not detail what specifically showed constitutionally inadequate representation by his attorney. His arguments on appeal highlight that the crux of his disagreement was over strategy, not due to any conflict of interest, and the evidence in the record shows that his distrust was not based in evidence, but only related to Samaniego's misperceptions about the defense counsel's access to evidence.

Samaniego told the court at each of the *Marsden* hearings that his attorney did not spend enough time with him. He said his attorney did not visit him frequently enough; when they visited, his attorney looked at his

72

watch; his attorney took vacations without telling him; and once he complained that he did not have his attorney's direct phone number. Defense counsel reported meeting with Samaniego for at least an hour each time they met and sometimes closer to two or three hours, and his visits averaged about two hours in length. He acknowledged looking at his watch because he had other clients and work to conduct, and he told the court at least once that he could not see his client as frequently as he wanted. He was spending a significant amount of time on Samaniego's case and was not burdened by other cases, and he had provided Samaniego with a direct phone number.

The court explained it was often in a defendant's best interest for the attorney to work in his office to put together the case. At one hearing, the court explicitly found that defense counsel had spent time with Samaniego and catered to some of Samaniego's requests, including efforts at transcribing audio recordings. The court implicitly determined that the amount of time counsel was spending with Samaniego was not inadequate. Further, the court explained that Samaniego had not stated sufficient grounds for a new attorney based on his subjective feeling that things were not happening in his case when a lot was occurring. We cannot say the court abused its discretion in drawing this conclusion based on the number and length of meetings defense counsel reported he or his office participated in.

Samaniego also expressed concerns about the discovery he was receiving. He complained his attorney was withholding discovery, that the discovery was provided too slowly, and that some discovery material was missing. He wanted his attorney to challenge the protective order that resulted in redactions of some of the material, and his attorney failed to file such a motion.

The trial court inquired about these concerns, but his attorney explained that he had little control over these issues. Defense counsel did not withhold discovery he had received from Samaniego at any point. The initial discovery came in the form of audio tapes, which Samaniego's attorney and his office played for Samaniego. Defense counsel requested the recordings that his office did not have but that Samaniego wanted, even those the attorney did not believe the prosecution planned to use and were not relevant. But Samaniego wanted transcriptions of the recordings, and those were not supplied by the district attorney. So, defense counsel supplied Samaniego with transcripts of the audio as his office completed the time-consuming task of transcribing the material.

At hearings where this was the primary complaint, the court concluded that allegations that the attorney was not properly representing Samaniego fell flat, and once the court asked Samaniego to show more patience, noting that discovery was slow because of witness safety concerns necessitating redactions. The record reflects that counsel was adequately sharing discovery information with Samaniego.

Further, with respect to complaints about redactions within the thousands of pages of written material, defense counsel told the court he had gone through each page with the district attorney, the district attorney believed the redacted items were not discoverable, and he said nothing relevant to the case had been blacked out. This was not a concern specific to Samaniego's attorney; redactions would have occurred because of witness safety concerns.

Samaniego challenged the adequacy of representation by questioning his attorney's experience and arguing that his attorney had failed to properly represent him at the juvenile transfer hearing. Samaniego complained that

his attorney did not give him an opportunity to review the briefs seeking a determination that the juvenile court should retain jurisdiction, and those papers excluded information Samaniego thought was important. He also told the court his attorney failed to prove his was 17 at the time of the crime, failed to call helpful witnesses at the juvenile hearing, and he argued that his attorney should have challenged the juvenile court's finding.

The court considered defense counsel's decade of experience, including cases involving violence, and determined the attorney's experience level was sufficient to adequately represent Samaniego.

The court explained the reason the matter was being heard in juvenile court was because Samaniego was 17 at the time of the shooting, indicating his attorney did not fail to prove this. The court's impression of the witnesses called by defense counsel was different from Samaniego's; in its view, defense counsel had "done everything he could do to get this case prepared for this removal hearing." The court explained to Samaniego that his attorney had filed a lengthy pleading which raised every possible issue that could be raised, and it explained that Samaniego's concerns regarded guilt or innocence, but that information would not have appropriately been before the juvenile court at that time. Finally, defense counsel filed a writ to challenge the juvenile court's determination, but the appellate court denied it. The court's review of these charges demonstrates they lacked merit. Thus, it was not an abuse of discretion to deny his *Marsden* motions for these reasons.

Some of Samaniego's other complaints were likewise unfounded. For example, Samaniego repeatedly told the court he did not trust his attorney because, he alleged, defense counsel had lied numerous times. When pressed, Samaniego specified that the lie was that his attorney knew the codefendants had become cooperating witnesses and lied about not knowing where those

witnesses were housed. Defense counsel denied this, explaining no one had informed him the former codefendants would become cooperating witnesses, and at the time he discussed the issue with Samaniego, he believed both were in custody. The court concluded there was no credible evidence defense counsel had lied to his client. (*Webster*, *supra*, 54 Cal.3d at p. 436 [with questions of credibility, court is "entitled to accept counsel's explanation[s]"].)

The other "lie" Samaniego identified was an alleged promise his attorney made to request bail reduction or a release on his own recognizance, along with agreeing to consider Samaniego's ideas. Samaniego's concern was a strategy-related one. And although counsel agreed to consider Samaniego's ideas, he decided against many of them. For example, defense counsel did not believe a bail reduction hearing was worth the risk of the court increasing the bail amount. The court viewed this complaint as one related to strategy, explaining that bail review requests were not common in certain instances because it makes the case more public and harder to seat an impartial jury. (See *Alfaro*, *supra*, 41 Cal.4th at p. 1320.)

Samaniego also told the court he did not trust his attorney because his attorney was pressuring him to enter a plea agreement. Defense counsel clarified that he had discussed potential plea bargains, and later he provided Samaniego with a statement about what Samaniego might be willing to offer, and he told the court that Samaniego declined a nine-year stipulated offer. The court told Samaniego that defense counsel was required to address a potential plea with his client, and it explained that it would be rare in a case involving a murder charge for an attorney not to discuss that possibility.

Samaniego's misconceptions about the role of an attorney and his tactical decisions are not sufficient to demonstrate inadequate representation or irreconcilable differences; thus, the court's determination that these

76

alleged "lies" or discussions about a potential plea could not form the basis of a substitution of counsel did not abuse discretion.

Samaniego's remaining complaints related to tactical and strategic decisions. He wanted his attorney to hire particular expert witnesses, to call certain witnesses at the preliminary hearing, and to file a section 995 motion to dismiss certain charges. His attorney explained that these tactics were considered. He told the court he did not believe the specific experts Samaniego wanted would assist in the case. He did not file a section 995 motion because a cooperating witness had testified at the preliminary hearing, and that was sufficient to bind the case over for trial. The court likewise explained to Samaniego why a section 995 motion may not have been strategically wise before denying the motion on that basis.

We agree with the trial court that these decisions were tactical ones, left within the discretion of the attorney. As disagreements about tactical decisions do not constitute an irreconcilable conflict (*Cole*, *supra*, 33 Cal.4th at p. 1192), the court did not abuse its discretion by concluding these disagreements did not warrant a substitution of counsel.

Finally, we turn to Samaniego's concern that his attorney would not seek jury instructions for voluntary and involuntary manslaughter. While Samaniego may have been concerned about that, his attorney told the court that it would ask for those instructions, but it would depend on the state of the evidence, and it would be up to the court. The court considered this information before denying the motion, concluding that it appeared that defense counsel was working hard and in Samaniego's best interest. And counsel did request a voluntary manslaughter instruction, which, as we previously discussed, was not supported by the evidence. It does not appear that Samaniego's claim that his attorney did not consider his ideas was valid.

77

Citing *McCoy v. Louisiana* (2018) ___ U.S. ___ [138 S.Ct. 1500], Samaniego implies that his disagreements with counsel were not about strategy for how to achieve his objectives, but about actual defense objectives. In *McCoy,* the attorney conceded guilt for three murders to avoid a death sentence even though the defendant wanted to pursue an acquittal. (*Id.* at p. 1506.) The Supreme Court held that the attorney could not force a defendant to concede guilt and could only make "strategic choices about how to best *achieve* a [defendant's] objectives." (*Id.* at p. 1508.) Samaniego attempts to cast his situation as similar to the defendant in *McCoy* by claiming that his defense objectives were not honored. But his claims do not show that defense counsel ignored Samaniego's objectives. Like the defendant in *McCoy,* Samaniego's objective was to maintain his innocence, and defense counsel can make strategic choices for how to best achieve the objective. (*Ibid.*)

We recognize that Samaniego's January 16, 2019 request for a *Marsden* hearing was improperly denied, and Samaniego once mentioned a conflict with the defense team without specifically requesting a *Marsden* hearing. However, these events do not constitute prejudicial error because the court subsequently held a *Marsden* hearing at which Samaniego an opportunity to express all his concerns and the court concluded he was receiving adequate representation. The court's denial of that motion did not abuse its discretion.

## XII.

## RESTITUTION

Citing *People v. Dueñas* (2019) 30 Cal.App.5th 1157, Samaniego argues the court violated his due process, equal protection, and Eighth Amendment rights by imposing fines and fees without a finding he had the ability to pay. He acknowledges he made no request to present argument or evidence on the

78

issue but maintains that was because he could not have anticipated the assessments could be challenged as excessive fines. He notes that he requested a hearing three days after sentencing, and he contends any finding of forfeiture demonstrates ineffective assistance of counsel.

A restitution fine under section 1202.4, subdivision (b), is a punishment for a crime. (*People v. Castellano* (2019) 33 Cal.App.5th 485, 489.) Inability to pay "may not be considered a compelling and extraordinary reason not to impose the restitution fine; inability to pay may be considered only when increasing the amount of the restitution fine above the minimum required by statute." (*Ibid*; *People v. Romero* (1996) 43 Cal.App.4th 440, 448 [ability to pay is a relevant factor in setting restitution fine exceeding minimum].) The statutory minimum restitution fine is $300 per case. (§ 1202.4, subd. (b)(1).)

The trial court imposed a restitution fine of $10,000 under section 1202.4, subdivision (b), exceeding the $300 statutory minimum. (See *ibid*.) Samaniego did not object to the fine even though he had a statutory right to challenge it. (See *id*., subd. (c).) His failure to challenge the fine forfeits his challenge now based on ability to pay. (*Avila*, *supra*, 46 Cal.4th at p. 729 [failure to object to fine under section 1202.4 based on ability to pay caused forfeiture]; *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153-1154 (*Frandsen*) [failure to challenge assessments and restitution forfeited argument on appeal].)

Samaniego argues that assessments under Penal Code section 1465.8 and Government Code section 70373 are "fines" for purposes of the Eighth Amendment's prohibition on excessive fines (*People v. Cowan* (2020) 47 Cal.App.5th 32, 45, review granted June 17, 2020, S261952 (*Cowan*)), and that because *Cowan* had not been decided at the time of his trial, his attorney could not have reasonably anticipated an ability to challenge the assessments

as excessive fines.  Thus, he maintains that he did not forfeit the right to challenge the $294 in assessments and fees without an ability-to-pay hearing. Alternatively, he contend his attorney's failure to request an ability-to-pay hearing demonstrates ineffective assistance of counsel because there could be no tactical reason for failing to ask the court not to impose them.

Samaniego had the opportunity and incentive at sentencing to object for lack of ability to pay the restitution fine, but he did not.  If Samaniego chose not to object to the $10,000 restitution fine based on inability to pay, he would not have objected to the additional $294 in fees.  Accordingly, we conclude Samaniego forfeited any challenge to the assessments and fees for failure to object to their imposition at sentencing.  (See *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033 [failure to challenge restitution fine greater than minimum for inability to pay forfeits objection to fees on same grounds]; *Frandsen*, *supra*, 33 Cal.App.5th at pp. 1154-1155.)

Further, although he maintains that he was excused from raising the issue because he was sentenced before the *Cowan* opinion was issued, he was sentenced several months after we issued our opinion in *People v. Kopp* (2019) 38 Cal.App.5th 47, 95-96, review granted, Nov. 13, 2019, S257844 (*Kopp*), in which we explained that assessments imposed under Penal Code section 1465.8, as well as Government Code section 70373 and former

Government Code section 29550.1 could properly be challenged by a defendant for inability to pay.[9]

Samaniego maintains that had the court considered ability to pay, it would have determined he lacked the ability to do so because there was nothing in the record that indicates he possessed any assets, he was represented by the public defender, and he was sentenced to a lengthy prison sentence.

Samaniego's counsel may have decided not to raise an ability-to-pay argument regarding the fees and assessments in this case if he determined the challenge would have been futile. Although Samaniego claims there is nothing in the record to suggest ability to pay, it was Samaniego's burden to prove this, and it is just one factor for assessing whether a fine is disproportionately punitive when an excessive fines objection is interposed. (*Cowan*, *supra*, 47 Cal.App.5th at p. 49, review granted; *Kopp*, *supra*, 38 Cal.App.5th at pp. 96, 98, review granted.)

Further, the record indicates that Samaniego previously had a moving company that hired others. He also had potential access to funds to pay for private counsel through Jessica's family. Thus, there was evidence in the record of an ability to pay, and Samaniego has not cited any evidence in the record indicating that during his incarceration he will be unable to pay at least some of the $294 imposed as nonpunitive fees. He therefore has not

---

[9] In contrast to our conclusion in *Kopp* that court facilities assessment, the court operations assessment fees, and the criminal justice administration fee are not punitive in nature, a panel of the First District, Division Four, concluded in *Cowan* that because assessments imposed under Government Code section 70373 and Penal Code section 1465.8 are conditioned on committing a crime, they serve in part to punish the defendant. (*Cowan*, *supra*, 47 Cal.App.5th at p. 45, review granted.) We part with the panel in *Cowan* on this point.

shown that his counsel deficiently overlooked a meritorious challenge.  (See *People v. Ochoa* (1998) 19 Cal.4th 353, 432 ["Counsel did not perform deficiently for failing to make what would have been a meritless request"].)  Thus, we cannot conclude his failure to request the ability-to-pay hearing was the result of ineffective assistance of counsel in this instance.

## DISPOSITION

The judgment is affirmed.

HUFFMAN, Acting P. J.

WE CONCUR:

O'ROURKE, J.

IRION, J.